OPINION OF THE COURT
Chief Judge Kaye.
Defendant’s case, here on direct appeal from a jury verdict of guilt of first degree murder and a jury sentence of death, has a complex history that we know well (see People v Mateo, 93 NY2d 327 [1999]; Matter of Relin v Connell, 92 NY2d 613 [1998]). Implicated in four murders and other violent crimes in Rochester, on December 19, 1996, defendant was charged in a 22-count indictment with, among other things, three counts of first degree murder.[1] Count 10 of the indictment, contested in this *394 appeal, alleged that on or about November 2, 1996, in the course of and in furtherance of first degree kidnapping, defendant intentionally caused the death of Juan Rodriguez-Matos, or, intending Matos’ death, commanded another—his wife, Monica Szlekovics—to kill him (Penal Law § 125.27 [1] [a] [vii]). In either circumstance, the cause of death was alleged to be a gunshot wound.
Counts 11 and 12 of the indictment charged defendant with first degree murder on a serial killer theory that he acted “in a similar fashion” when, within a 24-month period, he intentionally murdered four individuals, including Matos. On defendant’s motion, the trial judge dismissed those counts (175 Miscv 2d 192 [Monroe County Ct 1997, Connell, JJ), and the Appellate Division affirmed (249 AD2d 894 [4th Dept 1998]). We affirmed, concluding that the evidence presented to the grand jury was insufficient to establish that the killings at issue were “committed in a similar fashion” under Penal Law § 125.27 (1) (a) (xi) (People v Mateo, 93 NY2d 327 [1999]).
Prior to trial, relying on United States v Jackson (390 US 570 [1968]), defendant challenged the plea provisions of New York’s recently enacted death penalty statute (L 1995, ch 1). He argued that those provisions[2] created a two-tiered system of punishment for the same offense, because only those who went to trial faced the death penalty while those who waived a jury trial and pleaded guilty did not. This scheme, he argued, impermissibly burdened his Fifth and Sixth Amendment trial rights. The trial judge, adhering to Jackson, held the plea provisions unconstitutional, but the Appellate Division subsequently declared them constitutional (Matter of Relin v Connell, 251 AD2d 1041 [4th Dept 1998]). Defendant thereafter went to trial, while an appeal of the Appellate Division ruling was pending in this Court. Ultimately, bound by Jackson, we reversed, struck the plea provisions as unconstitutional and, in a consolidated appeal, severed them from the statute (Matter of Hynes v Tomei; Matter of Relin v Connell, 92 NY2d 613 [1998]).
I.
The facts of defendant’s case, elicited at trial, are no less complicated than its legal history. The main participants in the events of October 8 through November 6, 1996 were defendant (then age 27), his wife (Monica, 20), his estranged girlfriend *395 (Janette Sanchez, 25) and his brother (Victor Cordero, 16). Forty-nine witnesses, many of them civilians who had crossed paths with defendant, testified for the People. The defense called one witness, to testify regarding a bullet wound in defendant’s leg.
Though married to Monica, defendant had been living with Janette since November of 1995 in what was, to say the least, an abusive relationship. Janette told the jury that soon after she and her three young children moved in with defendant, he began terrorizing her: he hit her in the face, beat her in front of her children, threatened to stab her, and more than once aimed a gun at her and threatened to pull the trigger. At one point, he shot a round into the floor of their bedroom in front of her.
As Janette testified, on October 8, 1996, in a fit of rage over a busy telephone line, defendant hit her, and then began hitting her five-year-old daughter with a belt. Defendant locked them in the house, and left. Janette and her daughter escaped through a bedroom window. Janette then sought shelter at Alternatives for Battered Women, and remained there with her children. Three days later, on October 11th, defendant and Monica, in pursuit of Janette, showed up at 966 Avenue D, the home of Maria Sanchez (Janette’s sister), Jose Roman (Maria’s boyfriend) and Maria’s four-year-old daughter. Jose explained to the jury that he opened the door and defendant pointed a gun at his forehead. Defendant handcuffed him behind his back, put the gun to the back of his head and told him to lie down. For more than three hours, defendant and Monica held the family hostage while defendant ordered Maria to keep phoning Janette. Finally, Maria reached her and after defendant spoke to her, he and Monica left.
Throughout October, defendant persisted in his efforts to find Janette. He sent Monica to the shelter to give Janette his pager number so that she could call him. On October 16th, while Janette was at the Department of Social Services, defendant and Monica appeared, and defendant coaxed Janette into going to his apartment, without Monica. Soon after, Monica appeared at the door with a gun. She left, and defendant told Janette that he wanted to kill himself. Instead, he pointed the gun at Janette’s chest and said he would kill her because he could not allow her to be with anyone else. Janette later managed to return to the shelter. Two days later, defendant and Monica again accosted Janette on the street. When she ran to a nearby office, defendant followed her inside but security guards called *396 the police. Between October 8th and October 24th, defendant kept calling and leaving messages for Janette at the shelter. On October 24th, fearful that defendant would harm Maria, Janette went back to defendant for six days. On October 29th, a social worker from Child Protective Services helped Janette and the children move to another shelter. No longer reachable at Alternatives for Battered Women, it seemed that Janette had disappeared.
As defendant later conceded to police, his attack on the child had ended his relationship with Janette. He admitted searching the city for her, and acknowledged that he would hurt anyone who got in his way. One unfortunate victim was Juan RodriguezMatos, age 20. On or about November 2, 1996, defendant was driving around the east side of Rochester with Monica and Victor, still looking for Janette. Defendant spotted Matos on the street, and remembered that he and Janette had a friend in common, Glyselle, who might have information about Janette. Defendant ordered Monica, who was driving, to circle the block so he could confront Matos. He then directed her to stop, got out of the car and approached Matos, demanding to know Glyselle’s address. When Matos refused to answer, defendant forced him into the car at gunpoint and they drove to defendant’s house. There, defendant handcuffed Matos, brought him into the bathroom and questioned him. Matos finally gave defendant an address, but by that time defendant had already decided to take him to the basement and execute him. Defendant told police that he made this decision and Monica and Victor were following his orders—Monica and Victor did what he told them to do.[3]
Defendant admitted to the investigators that while in the basement, he put a dark handkerchief over Matos’ eyes, and then “shot the dude in the left side of his head as he stood there.” Matos fell on the floor, but was still alive, so defendant put a plastic bag over his head. He died some time later. In the middle of the night, defendant, Monica and Victor wrapped the body in a blanket and some curtains and left it in an alley near where defendant used to work. A subsequent autopsy of Matos’ *397 body revealed that, although he aspirated gastric contents into his lungs, the cause of death was the gunshot wound to the head. Defendant later told police during questioning that he had handed the gun to Monica and that, in actuality, it was she who pulled the trigger and he was “surprised.” For the most part, he insisted that he had fired the fatal shot, but he alternated back and forth. In a third version, defendant claimed that even though Monica had pulled the trigger, he was a “king” and would take the blame because he wanted the death penalty and could not “do a hundred years in jail.” When police typed his written statement, defendant claimed to have pulled the trigger himself.
On November 6th, defendant, Monica and Victor carried out a second home invasion at 966 Avenue D. On that day, they went back to Maria and Jose’s apartment house, but hid in the basement. Defendant still wanted to find Janette, and told Monica and Victor that Janette had filed a police complaint against him. Defendant later explained, “[t]hat was a lie and I was using them to help me get my girl back.” After waiting about three hours, defendant said “let’s go upstairs.” Defendant told Monica to knock on the first floor apartment door (Maria lived on the second floor); when the occupant—Willie McWilliams—opened the door, defendant put a gun to his face.
McWilliams testified that defendant hit him on the left side of his head with the gun, and told him to “get on the floor.” A stranger to defendant and his objectives, McWilliams dropped to his knees and Victor handcuffed him. Asked who else was in the house, first McWilliams said “nobody,” but then said that his girlfriend and son were sleeping. Defendant checked the other room, grabbed a knife, came back, and said, “I never taken out a little kid before.” Victor said, “we got to take them all out.” McWilliams yelled out to his girlfriend to run. Defendant stepped on McWilliams’ back and cut him across the throat. When McWilliams reared up, defendant fell backwards, began shooting and struck him in the shoulder and back. One of McWilliams’ handcuffs came loose and he hit defendant in the face. Defendant fell again, dropping his gun, and apparently was shot in the leg during the fray. Defendant and Victor took off, leaving Monica behind. McWilliams held her down while his girlfriend, who escaped to a neighbor’s house, called 911. After the police arrested Monica at the scene, she provided information leading to the arrest of defendant and Victor. They were apprehended later that day in a car with defendant’s mother, another brother and a cousin.
*398 Now, following a jury trial, defendant stands convicted of first degree murder and other charges.[4] After a penalty proceeding in which he presented mitigating evidence, the jury sentenced defendant to death.
Defendant’s mandatory appeal, raising 22 issues, was noticed February 11, 1999, and comes to us directly from the trial court pursuant to our unique jurisdiction in death penalty cases (NY Const, art VI, § 3 [b]; CPL 450.70 [l]).[5] Defendant argues that Matter of Hynes v Tomei (92 NY2d 613 [1998]) and People v Harris (98 NY2d 452 [2002]) require overturning his death sentence, because he went to trial under what we have held to be an unconstitutional two-tiered penalty scheme. We agree, and conclude that the death sentence must be set aside.
Defendant also contends that his right to due process was violated by the prosecutor, on the ground that inconsistent factual theories were presented at his and Monica’s separate trials. We disagree, and determine that the prosecutor’s actions did not breach defendant’s right to a fair trial. Defendant claims that the jury verdict of guilt of first degree felony murder is against the weight of the evidence. We disagree, and in our review of the facts conclude that the weight of the evidence comports with the jury determination that defendant kidnapped Matos, and in the course of and in furtherance of that crime, either intentionally shot and killed him or commanded his wife and cohort, Monica, to do so.[6]
*399 Finally, defendant maintains that certain evidentiary errors, including the admission of his statements about three other murders, mandate the reversal of his conviction. We disagree. Defendant’s trial strategy opened the door to the admission of his voluntary statements, to rebut the assertions that he gave false statements to police exaggerating his role in the Matos murder in order to exculpate his wife.
II.
Defendant contends that an Appellate Division declaration made prior to his trial—holding the plea provisions of New York’s death penalty statute constitutional—subjected him to an unconstitutional penalty scheme, and that our subsequent decisions in Matter of Hynes v Tomei and People v Harris mandate that we set aside his death sentence. In Hynes, we struck the plea provisions as unconstitutional and severed them from the statute, on the ground that they created a two-tiered punishment scheme that burdened the rights of defendants who went to trial (92 NY2d 613 [1998]). In Harris, we set aside the death sentence of a defendant who went to trial while the plea provisions were in effect (98 NY2d 452, 494-496 [2002]). We break no new ground by applying these precedents, and dispose of defendant’s Hynes claim first, striking defendant’s sentence of death.
The People and the Attorney General maintain that in this case, the trial court’s order declaring the plea provisions unconstitutional controlled the course of the litigation, and that defendant actually went to trial under a lawful statute. The question before us is whether a subsequent declaration by the Appellate Division, Fourth Department, that the plea provisions were constitutional (251 AD2d 1041 [1998]), rendered those provisions operative in his case. The People and the Attorney General concede that if the plea provisions were in effect during defendant’s case, the death sentence must be vacated.
A brief procedural history is required to frame the issue. Defendant was indicted on first degree murder and other charges on December 19, 1996, and the prosecution filed its notice of intent to seek the death penalty pursuant to CPL 250.40 (2) on January 17, 1997. On April 24, 1997, defendant moved to strike the death notice and the plea provisions of New York’s death penalty statute as unconstitutional, relying on United States v Jackson (390 US 570 [1968]). In Jackson, the United States Supreme Court invalidated the death penalty provision of the *400 Federal Kidnaping Act (18 USC § 1201 [a]) because, in relevant part, by encouraging jury waivers to avoid the death penalty, the provision impermissibly burdened defendants’ Fifth and Sixth Amendment rights. Relying on Jackson, the trial court, on August 25, 1997, granted defendant’s motion to the extent that it declared the plea provisions unconstitutional (175 Misc 2d 192 [1997]).
The People then commenced a CPLR article 78 petition in the Appellate Division seeking a writ of prohibition to bar both the trial judge and defendant from enforcing the order declaring the plea provisions unconstitutional. On June 10, 1998, the Fourth Department converted the article 78 proceeding to a declaratory judgment action and held the plea provisions constitutional (251 AD2d 1041 [1998]). Jury selection commenced on September 1, 1998 and the jury was sworn on November 9, 1998. On December 3, 1998, the jury found defendant guilty of first degree murder and other charges, and on December 16,1998, sentenced him to death.
Six days later, on December 22, 1998, this Court reversed the order of the Fourth Department, as well as a comparable order of the Second Department, and struck the plea provisions as unconstitutional under authority of Jackson (92 NY2d 613 [1998]). Shortly thereafter, defendant moved to set aside his death sentence, relying on Hynes. On January 15, 1999, the trial judge summarily denied the motion and ordered the death sentence to be carried out based on the jury’s determination. Defendant now contends that the Fourth Department ruling upholding the plea provisions was in effect in his case when he went to trial and therefore the trial was conducted under a Joc/eson.-violative statute. We agree.
To be sure, defendant received a favorable pretrial ruling from the trial court striking the plea provisions from the statute. By the time that defendant’s trial commenced, however, the Appellate Division had declared the plea provisions constitutional, in an action by this District Attorney against this trial judge and this defendant. That ruling was binding in the Fourth Department (see e.g. Duffy v Horton Mem. Hosp., 66 NY2d 473, 475 [1985]). Based on that binding precedent, we conclude that defendant could have sought to avoid exposure to a death sentence only by waiving his right to a jury trial and pleading guilty.
Matter of Morgenthau v Erlbaum (59 NY2d 143 [1983]) does not mandate a different result in this case. We held in Erlbaum *401 that “a declaratory judgment attacking a criminal court’s interlocutory ruling may be granted when the controversy is over the validity of a statute, . . . and there is no immediate attempt to prevent the criminal court from proceeding on the course which it has charted by its ruling” {id. at 151-152). Erlbaum, moreover, contemplates that an individual defendant will not be a party to the declaratory judgment action. (Here, defendant was a party.) The Appellate Division order—determining the validity of the statute—did not reverse the trial court’s order, or immediately prevent the trial court from proceeding on its course. At the time the Appellate Division ruled, the case was several months from being tried. There was no ensuing delay of trial. Indeed, defendant went to trial while the Appellate Division ruling, reinstating the plea provisions, was simultaneously challenged in this Court. Thus, the “concern over obstructing the speedy resolution of cases” (id. at 152) did not arise. In these circumstances, Erlbaum's policy considerations—protecting criminal trials from interference, or even undoing, by interlocutory appeals—were not implicated.
Exactly the situation Jackson held untenable, however, occurred here. Like any other capital defendant in the Fourth Department, had defendant sought to waive his right to a jury trial and plead guilty—with the appellate court’s ruling in hand—it was highly improbable that the trial judge would have ignored the order of the Appellate Division. Thus, the fortuitous timing of defendant’s trial, sandwiched in between the Appellate Division ruling and this Court’s decision striking the plea provisions, contributed to a unique situation in which defendant’s Fifth and Sixth Amendment trial rights were burdened and he was tried under an unconstitutional two-tiered penalty scheme. The sentence of death therefore must be set aside. We turn next to defendant’s challenges to the verdict of guilt.
III.
Defendant contends that the prosecutor violated due process by positing, in his trial, a theory of first degree murder factually inconsistent from that argued at Monica’s trial. He also maintains that the trial court erroneously instructed the jury that it could find defendant guilty of first degree murder whether he shot Matos or commanded the killing, and that the jury verdict on that count is against the weight of the evidence.
A. The Prosecution’s Theories
Monica was prosecuted separately—about a year before defendant’s trial—on the theory that she was guilty, as the *402 shooter, of intentional first degree felony murder (Penal Law § 125.27 [1] [a] [vii]) in the course of and in furtherance of first degree kidnapping, in a noncapital trial. The jury acquitted her of that count but convicted her of second degree felony murder and first degree kidnapping. At his trial, defendant sought to preclude the prosecution from arguing in his case that he was the shooter, on the ground that the People previously dismissed that theory in Monica’s case.
The trial court rejected defendant’s claim, determining that at defendant’s trial, the People were free to argue alternatively that either defendant or Monica—commanded by defendant— pulled the trigger. The court concluded that “the People are merely intending to argue reasonable views of the evidence that could be drawn from the testimony and physical evidence” (177 Misc 2d 817, 818 [Monroe County Ct 1998, Connell, J.]).
Defendant claims that by advancing purportedly inconsistent theories, the People corrupted the truth-finding function of the trial. It is settled that a prosecutor may not knowingly present admissible but false information to a jury (People v Pelchat, 62 NY2d 97, 105 [1984]). Of course, in the circumstances of this case, where defendant and Monica implicated not only themselves but also each other, the People could not know who the shooter was—only defendant and Monica knew.
Defendant contends that at the separate trials, the prosecution presented diametrically opposed versions of his role in the shooting. To be sure, at Monica’s trial for first degree felony murder, the prosecutor argued that Monica shot Matos. But at defendant’s trial, the prosecutor presented that very same proposition, again arguing that Monica intentionally shot him, albeit under defendant’s orders. Defendant was not “resculpted” from a mere sideliner to a main participant (cf. United States v Salerno, 937 F2d 797, 812 [2d Cir 1991], revd on other grounds 505 US 317 [1992]). In both trials, defendant was portrayed as the “driving force” behind the crime. Additionally, the People maintained that, based on defendant’s own written statement, it was also reasonable to conclude that he was the one who pulled the trigger. Thus, defendant’s jury considered the same argument that the prosecutor presented at Monica’s trial, and also considered a theory supported by defendant’s own words.
In assessing this claim, we find Nguyen v Lindsey (232 F3d 1236 [9th Cir 2000]) persuasive. There, an innocent bystander was killed in the crossfire of a shootout between two rival gangs; *403 two combatants were charged with murder and separately tried. At the trial of defendant Phung, the prosecutor presented evidence that Phung shot first. At the trial of defendant Nguyen, the prosecutor introduced Nguyen’s own statement to police that a cohort in his car, Cholo, had fired first. The Ninth Circuit held that the prosecutor did not pursue fundamentally inconsistent theories in violation of due process, even though different evidence was presented at each trial (id. at 1241). Although the prosecutor made divergent arguments at each trial as to who fired the first shot, the court concluded that these arguments were consistent with the evidence actually adduced at each trial (id. at 1240).
Here, as in Nguyen, the evidence against Monica at her trial was her own statement that she killed Matos after defendant gave her the gun and whispered in her ear to shoot him in the head.[7] The evidence at defendant’s trial was his self-incriminating admissions that he intended to execute the victim, and either shot the victim or commanded Monica to do so.
Nguyen also distinguished Thompson v Calderon (120 F3d 1045 [9th Cir 1997] [en banc] [plurality op], revd on other grounds 523 US 538 [1998]), relied on by defendant. In Thompson, separate trials were conducted of two suspects in the rape and murder of Ginger Fleischli. Testimony by jailhouse informants at a preliminary hearing revealed that defendant Leitch wanted Fleischli dead because she was interfering with his attempts to reconcile with his ex-wife (120 F3d at 1055). On the night of the murder, defendant Thompson allegedly had consensual sex with Fleischli. Afterward, Leitch arrived and he and Thompson killed her.
At Thompson’s trial, the prosecution presented other witnesses who testified that Thompson had confessed to raping and killing Fleischli before Leitch got home, and that he killed her to prevent her from reporting the rape (id. at 1056). Thompson was convicted of first degree murder and sentenced to death. Then, at Leitch’s trial, the prosecutor called mostly defense witnesses from Thompson’s trial, who testified about Leitch’s motive for killing Fleischli, his threats against her and his violent disposition. A plurality of the court concluded that in Leitch’s trial, the prosecutor returned to his original theory and discredited the very evidence he had previously offered in *404 Thompson’s trial, so that Thompson, rather than Leitch, suffered from the due process deprivation (id. at 1059). In Nguyen, by contrast, the court found it compelling that both defendants could be found guilty of the same crime because of its nature (232 F3d at 1240).
The circumstances of defendant’s case are closer to Nguyen than Thompson. The prosecutor never discredited the central evidence he previously offered to convict Monica, but instead used that evidence to prove that defendant commanded her to shoot Matos. Thus, as the People sought to prove, both defendants could have been guilty of first degree murder. The argument that defendant was the shooter was also properly adduced at trial, based on his admissions. In these circumstances, the People should not have to choose one defendant over the other to prosecute as the shooter.
Defendant also argues that at Monica’s trial, she was portrayed by the People as acting with free will, whereas at defendant’s trial, the evidence showed that she was abused and acted at defendant’s command. These positions are not inherently inconsistent. At Monica’s trial, the People were countering her duress defense, and sought to show that she was capable of freely committing the murder. The prosecution acknowledged that Monica was abused, but argued that the abuse did not mean she could establish duress: “What was the abuse? What did it consist of? . . . [W]hat effect does it have on this case? . . . [Yjou’re going to hear that Angel Mateo was a bad man, and I anticipate you are going to hear that he was the driving force here, but I also anticipate you are going to hear that Monica Szlekovics was involved.” At defendant’s trial, by contrast, duress was not in the case. The People were entitled to show that, fearful or not, Monica could have willingly followed defendant’s command.
B. The Command or Actual Killer Instruction
Defendant claims that it was error for the trial court to instruct the jury that it could convict defendant of first degree murder either as a commander or shooter. Penal Law § 125.27 (1) (a) (vii), the “felony murder” provision of the first degree murder statute (see People v Harris, 98 NY2d 452, 475-477 [2002]), states that a person is guilty of first degree murder when, with intent to cause the death of another person, he causes the death of that person or a third person, and:
“the victim was killed while the defendant was in *405 the course of committing or attempting to commit and in furtherance of . . . kidnapping in the first degree . . . ; provided however, the victim is not a participant . . . and, provided further that, unless the defendant’s criminal liability under this sub-paragraph is based upon the defendant having commanded another person to cause the death of the victim or intended victim pursuant to section 20.00 of this chapter, this subparagraph shall not apply where the defendant’s criminal liability is based upon the conduct of another pursuant to section 20.00 of this chapter.”[8]
In turn, Penal Law § 20.00, the accessorial liability provision, provides that “[w]hen one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.”
Based upon the plain language, it is clear that the Legislature has set forth a single circumstance by which to impose accessorial liability for first degree felony murder. An actor may be found guilty as an accessory under Penal Law § 125.27 (1) (a) (vii) only when the theory proved by the prosecution is that the defendant commanded the killing (see People v Couser, 94 NY2d 631, 635 [2000] [“(a) defendant’s criminal responsibility for murder in the first degree can be based upon the conduct of another when that defendant ‘commanded another person to cause the death of the victim or intended victim’ ” (emphasis in original)]).
By comparison, the Legislature chose not to limit accessorial liability for the other 12 subparagraphs of the first degree murder statute (see generally People v Cahill, 2 NY3d 14 [2003] for a discussion of 13 aggravating factors of first degree murder statute). It is only the felony murder aggravator that is so limited. Indeed, the Assembly Codes Committee memorandum explains that the felony murder provision “excludes defendants whose criminal liability under this subparagraph is based upon the conduct of another person, unless the defendant commanded *406 another person to cause the death of the victim or intended victim” (Mem of Assembly Codes Comm, Bill Jacket, L 1995, ch 1, at 22 [emphasis added]).[9]
The legislative history supports the conclusion that, while the Legislature limited accessorial liability for first degree felony murder to “commanding],” it did nothing to upset the settled principle that “[t]here is no distinction between liability as a principal and criminal culpability as an accessory” (People v Duncan, 46 NY2d 74, 79-80 [1978]). When it enacted the statute, the Legislature was surely aware of our decisions interpreting the accessorial liability statute (see generally People v Robinson, 95 NY2d 179, 183-184 [2000]). If the Legislature had wanted to set forth “command” as a separate element of the first degree felony murder offense, moreover, it would have done so.[10]
The question here is whether due process requires that the command theory be considered by the jury apart from the actual killer theory, and that the jury be unanimous on one theory or the other, even though the Legislature expressly intended that the two coexist in the same subparagraph of the statute.[11] We conclude it does not.
The trial court’s instructions comported with due process. In Schad v Arizona (501 US 624 [1991]), the United States *407 Supreme Court analyzed an Arizona statute that defined first degree murder as, among other things, premeditated murder or murder committed during a felony. Justice Souter, writing for a plurality, observed that there is a “point at which differences between means become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses” (501 US at 633).
The Schad plurality adopted a case-by-case approach of analyzing the problem, while deferring to the states: “ [i]f a State’s courts have determined that certain statutory alternatives are mere means of committing a single offense, rather than independent elements of the crime, we simply are not at liberty to ignore that determination and conclude that the alternatives are, in fact, independent elements under state law” (id. at 636). The plurality observed that “[w]here a State’s particular way of defining a crime has a long history, or is in widespread use, it is unlikely that a defendant will be able to demonstrate that the State has . . . defined as a single crime multiple offenses that are inherently separate” (id. at 640).
Although New York’s current first degree murder statute is recently enacted, the term “command,” under our law, has its roots in the 1907 Penal Code, which defined a “principal” as “[a] person concerned in the commission of a crime whether he directly commits the act constituting the offense or aids and abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces or procures another to commit a crime” (People v Farmer, 196 NY 65, 76 [1909] [Bartlett, J., dissenting, quoting Penal Code of 1907 § 29] [emphasis added]; see also Couser, 94 NY2d at 637).[12] Almost 100 years ago, then, a commander was not only just as culpable as a person who directly committed an offense, but also was indeed a principal.
In a related vein, Schad is instructive in its observation that if two possibilities for proving an element exist, an appropriate inquiry is whether a moral equivalence between the two could reasonably be found (501 US at 644). If so, it is enough to rule out the argument that any hypothetical “moral disparity bars treating them as alternative means to satisfy” the element of a *408 single offense (id.). We have a long history of treating actual killers and commanders as moral equivalents (see Farmer, 196 NY at 70-71).[13]
Defendant nevertheless contends that he could have been guilty of only one of the two theories—shooting or commanding—and therefore a different result should obtain. Indeed, he argues that the prosecutor must prove to the jury’s satisfaction precisely what occurred as a matter of historical fact. This is so, he claims, for any issue that is critical to the main dispute in the case.
As we sift carefully through the evidence, it becomes apparent that defendant makes much of what is essentially a preliminary fact. “Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict” (Schad, 501 US at 632, quoting McKoy v North Carolina, 494 US 433, 449 [1990] [Blackmun, J., concurring]). Defendant certainly kidnapped the victim—that is undisputed. He took on the mental state required: it was his decision to execute Matos. Thus, whether he personally pointed the gun at the victim’s head and pulled the trigger, or whether, handing the gun to Monica, he gave her an order and stood near as she carried it out, the two choices for the jury were not so different that they amounted to any more than alternatives to a common end. Indeed, Justice Souter wrote that in analogous circumstances, “[w]e have never suggested that in returning general verdicts . . . the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone” (501 US at 631).
We have, more recently, had occasion to employ this principle in similar circumstances. For example, in People v Rivera (84 NY2d 766 [1995]), the defendant was indicted for second degree murder as a principal. Concluding there was no bar to the People’s assertion at trial that defendant acted as an accomplice, we held that the elements of the crime were the same, *409 whether the defendant acted in either role (id. at 771). The facts showed that the victim was shot once and died from the wound. Witnesses saw defendant and two cohorts, all of whom had guns drawn, near the victim. The victim looked at defendant and said, “[y]ou shot me” before falling down (id. at 768). Thus, the People were entitled to prove that defendant intended the victim’s death, and caused the death either by shooting his gun or by aiding the shooter. To convict, the People had to prove each element of the crime, and defendant’s liability was the same whether he acted as either a principal or an accessory (id. at 770-771).
Similarly, in People v Russell (91 NY2d 280, 288-290 [1998]), we concluded that the prosecution was not required to prove which of the defendants fired the lone bullet that killed the victim, when the evidence established that each defendant, embroiled in a gun battle with the others, intentionally aided one another in a mutual combat that caused the death of an innocent bystander. Here, too, the prosecution need not have shown which of the two perpetrators actually fired the fatal shot.[14]
C. The Weight of the Evidence of First Degree Felony Murder
Defendant claims that his conviction for first degree felony murder based on either the shooter or the commander theory was against the weight of the evidence because the evidence proved, at most, that he was an ordinary accomplice and was guilty of second degree intentional murder (see Penal Law § 125.25 [1]; § 20.00).
The standard of appellate review of the legal sufficiency of the evidence in a criminal trial, of course, is “whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial” (Cahill, 2 NY3d at 57, quoting People v Bleakley, 69 NY2d 490, 495 [1987]). Viewing the evidence in a light most favorable to the People, as we must (People v Cabey, 85 NY2d 417, 420 [1995]), we conclude that there is certainly a valid line of reasoning by which a rational *410 person could have reached the conclusion of the jury and that defendant’s guilt was established beyond a reasonable doubt.[15]
In this capital case, in which a death sentence has been imposed, moreover, we are constitutionally required to review the facts (NY Const, art VI, §§ 3, 5; People v Davis, 43 NY2d 17, 36 [1977]). Our inquiry here is distinct from our traditional appellate review for legal sufficiency.
We recently reiterated that “weight of the evidence review recognizes that ‘[e]ven if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further’ ” (Cahill, 2 NY3d at 57, quoting Bleakley, 69 NY2d at 495). Thus, “[i]f based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, ‘weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony.’ If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict” (69 NY2d at 495 [internal citations omitted], quoting People ex rel. MacCraeken v Miller, 291 NY 55, 62 [1943]; Cahill, 2 NY3d at 58). Of course, “[g]reat deference is accorded to the fact-finder’s opportunity to view the witnesses, hear the testimony and observe demeanor” (69 NY2d at 495). When “an appellate court performs weight of the evidence review, it sits, in effect, as a ‘thirteenth juror’ ” (Cahill, 2 NY3d at 58, quoting Tibbs v Florida, 457 US 31, 42 [1982]). We must be sure that “the evidence is of such weight and credibility as to convince us that the jury was justified in finding the defendant guilty beyond a reasonable doubt” (Ca-hill, 2 NY3d at 58, quoting People v Crum, 272 NY 348, 350 [1936]).
With these standards in mind, we conclude that the evidence amply supports the first degree murder conviction. There is no question that defendant engineered and carried out the armed kidnapping of Matos, that defendant decided to kill him, handcuffed him, led him down to the basement, and that Matos died of an intentional gunshot wound to the head. No matter which version of defendant’s story the jury credited, it was justified in finding that defendant was squarely in charge of the kidnapping and shooting of Matos.
*411 (i.) The Command Theory
Despite defendant’s argument that there was no direct evidence that he told Monica to kill Matos, the circumstantial evidence strongly supports the conclusion that he did. On the day of Matos’ murder, defendant was again looking for Janette, with Monica and Victor under his sway. Defendant ordered Monica to turn the car around to confront Matos, he directed her to stop the car and he forced Matos into the car at gunpoint. It was defendant who took Matos into the bathroom and handcuffed him. By then, defendant had made a decision to take “the kid” down to the basement to execute him. Defendant told police that he made this decision and Monica and Victor were following his orders.
Defendant told Sheridan, “I had already made up my mind that I was going to kill him.” Defendant stated that he gave Monica the gun, and stood not far from her as she pulled the trigger. Observing that Matos was still alive, defendant placed a plastic bag over his head, further demonstrating his intent.[16] The only reasonable inference from these facts is that by word or deed, when he handed Monica the gun, he authoritatively directed her to pull the trigger (see Couser, 94 NY2d at 637).
After the shooting, defendant remained in charge. He explained to Sheridan that he set the alarm for 2:30 a.m. so that, after “partying,” they could get up and get rid of the body. He ordered Monica and Victor to go downstairs and wrap the body,[17] he told Victor to help them lift the body into the car, he made Victor sit in the back of the car with the corpse (because there was no room in the front seat) and he instructed Monica to drive to an alley near his old job to dispose of the body. When confronted by police with the theory that Monica was the shooter, defendant claimed surprise that Monica shot Matos in *412 the head. Sheridan later explained that defendant never said he was surprised that Matos was killed. It was reasonable to infer that defendant was surprised that Monica, whom he scorned, carried out the order. He acknowledged in his written statement that everything she did was “out of fear of me and what I would do.”
Throughout, defendant maintained his power over the other participants. The jury could easily have inferred that he gave an order to Monica to shoot Matos. The jury gave the evidence its proper weight and we will not disturb that determination. (ii.) The Shooter Theory
Defendant’s written statement to police provided the jury with solid evidence to conclude that he pulled the trigger:
“I handcuffed him behind his back and put him into the bathroom. Me and Monica were trying to figure out what we were going to do with him. I walked him down into the basement. I had already made up. my mind that I was going to kill him. In the basement I put a dark handkerchief over his eyes. I shot the dude in the left side of his head as he stood there. The dude fell on the floor. The dude wasn’t dead so I put a plastic garbage bag over his head. He was alive for about 2V2 hours. The dude just laid there on the floor making sucking noises. After awhile I checked on him and saw that he was dead.”
This was a forceful admission leading to the conclusion that defendant shot Matos. True, defendant appeared confused when police asked him about the blindfold over Matos’ eyes. Defendant said there was “nothing over the kid’s eyes.” Of course, defendant admitted covering Matos’ head with a plastic bag after the shooting, and never retracted that portion of his statement, so he must have seen the blindfold, which was shot through and bloodied. The jury may have inferred that he had forgotten about it by the time police asked about it.
We conclude the jury was justified in finding beyond a reasonable doubt that defendant, having decided to execute the victim, directed Monica to shoot Matos or shot the victim himself, and in rejecting his claim that he was merely guilty of second degree murder as an accomplice.
IV
Defendant maintains that his confession was involuntary and that the introduction, during re-cross-examination of a prosecu *413 tion witness, of part of it—statements about three other murders—was reversible error. We hold that the confession was voluntary and that, through his trial strategy, defendant opened the door to admission of his statements on other homicides.
A. The Voluntariness of the Confession
Defendant was arrested on the afternoon of November 6, 1996 based on leads Monica gave to police.[18] He contends that his will was overborne by the investigators who questioned him, because they allegedly led him to believe that he was receiving a compelling benefit—lenient treatment for family members—in exchange for his confession. This claim is without merit.
Following a Huntley hearing, the court determined that:
“[Defendant was properly advised of his Miranda warnings and made a knowing, voluntary and intelligent waiver of those warnings before speaking with the officers. During the ensuing hours of interviews, the defendant made numerous inculpatory, spontaneous, oral and written statements to the police concerning the events under investigation. There is no evidence that the police in any way coerced statements made by the defendant, nor induced them by any threats or promises, implied or otherwise, concerning either the charges in this case against the defendant or charges, real or imagined, against his family. The People met their burden in establishing the voluntariness of the statements of the defendant.”
An extrajudicial confession is inadmissible against an accused if it is involuntarily made (CPL 60.45 [1]; People v Anderson, 42 NY2d 35, 37 [1977]). A confession is “involuntarily made” when it is obtained by a public servant engaged in law enforcement activity by means of any promise or statement of fact which creates a substantial risk that the defendant might falsely incriminate himself (CPL 60.45 [2] [b] [i]).
To determine voluntariness, courts review all of the surrounding circumstances to see whether the defendant’s will has been overborne (Anderson, 42 NY2d at 38; Arizona v Fulminante, 499 US 279, 285-286 [1991]). Of course, “coercive police activity is a necessary predicate to the finding that a confession is not ‘voluntary’ within the meaning of the Due Process Clause of the *414 Fourteenth Amendment” (Colorado v Connelly, 479 US 157, 167 [1986]). In our analysis, the hearing court’s factual determinations, resting largely upon its assessment of the credibility of the testifying officers, are entitled to deference (see People v Prochilo, 41 NY2d 759, 761 [1977]). In a capital case, moreover, our obligation to weigh the evidence and determine whether the jury was justified in its conclusion beyond a reasonable doubt “extends to the hearing court’s finding as to the voluntariness of the confessions” (People v Carbonaro, 21 NY2d 271, 274 [1967]). These findings must be reviewed “by the same standards applicable to a verdict of guilt” (id., quoting People v Leonti, 18 NY2d 384, 389 [1966]).
Defendant concedes that the hearing court made “no findings adverse” to him. Under our independent factual review power, we find ample evidentiary support for the hearing court’s factual findings. A review of the circumstances here, moreover, shows that defendant’s confession was voluntary, and that coercive police activity did not occur.
Defendant was placed in an interview room just after 5:00 p.m. and immediately began asking to speak to the District Attorney, saying he only wanted to “deal with the head man.” He told another investigator, who was passing by in the hall, to send in the person handling his case while he still felt like talking. As soon as the homicide investigators entered the interview room at about 5:45 p.m. and introduced themselves, defendant announced that he had matters he wanted to clear up. Investigator Sheridan told defendant that first, he had to read him his rights. Defendant insisted he would tell them everything they wanted to know, but he wanted his family released. Investigator Sheridan gave defendant his Miranda warnings and defendant waived his rights.
Defendant immediately began talking. Before the investigator could put the Miranda card away, defendant stated that he would tell Investigator Sheridan what he wanted to hear, but repeated his demands. Sheridan explained, “I have to know what it is that you want to tell me” and defendant responded, “I will tell you about the homicides.” When Sheridan asked for more information, defendant said, “I can tell you about Johvanny.” Sheridan asked whether defendant killed Johvanny *415 (Diaz),[19] and defendant admitted that he did, and again repeated that he wanted his family released. Defendant then admitted to killing “a black guy near a milk plant” (Peter Holley) and to killing Matos.
Sheridan then told defendant that he would check on the status of his family members, but he at no time promised defendant that they would receive lenient treatment if defendant confessed. Indeed, defendant confessed to the murders without any prompting from the investigator other than requests for more information. As is obvious from the exchanges, defendant believed that he was in a position to influence the release of his family, acting under a self-created impulse to tell the police “everything” in order to achieve his own objective (see generally People v Gonzales, 75 NY2d 938, 940 [1990]).
Now, defendant claims that police led him to believe that they would limit the charges against his young brother, Victor, in exchange for his confession. By the point at which Victor’s charges were discussed, however, defendant had already confessed to the four murders and to sole possession of the gun. The investigators did not promise that they would fulfill his desire; to the contrary, they informed defendant that his brother would not be released. Nor, despite defendant’s claims, was there a true quid pro quo involving the dropping of gun charges against defendant’s mother and other relatives. Once defendant acknowledged that the gun was his, police released those relatives and informed defendant that they had been set free. This information did not render involuntary defendant’s subsequent elaboration about the murders.
Defendant also maintains that the investigators should have been required to tell him that his family’s fate was unrelated to whether he confessed, claiming they actively exploited his apprehension about his relatives. Yet the investigators were not required to dissuade defendant from making incriminating statements, or disabuse him of his fantasy that he could control the circumstances of the interrogation and win the release of his family. We find the reasoning of the Appellate Division in People v Johnson persuasive: “[i]t is not an improper tactic for police to capitalize on a defendant’s sense of shame or reluctance to involve his family in a pending investigation absent circumstances which create a substantial risk that a defendant might *416 falsely incriminate himself’ (177 AD2d 791, 792 [3d Dept 1991] [internal citation omitted]).
A comparison with the circumstances underlying our decision in Anderson (42 NY2d 35 [1977]) is instructive. In Anderson, defendant was held for more than 19 hours without probable cause. He was deprived of food and sleep for over 30 hours, questioned by eight or nine officers operating in teams, isolated from friends and family during the entire period, and was not told of his right to counsel until the interrogation had been underway for more than 13 hours (42 NY2d at 39-41). By contrast, in this case, police had ample cause to arrest defendant for the attack on McWilliams. Once in custody, defendant was given his Miranda warnings and waived them. Police offered defendant a cheeseburger, candy, water, coffee and cigarettes, as well as medical treatment. He insisted that he wanted to clear up the crimes, not go to a hospital. Defendant was questioned by two investigators. He was allowed two meetings with Victor and a meeting with Monica. He also was permitted a phone call to his mother, to verify that she had returned home. On this record, there is no evidence that defendant’s will was overborne or his capacity for self-determination impaired, and every indication that he spontaneously, aggressively and voluntarily confessed to suit his own purposes.[20] B. The Admission of the Statements about Other Homicides
Defendant claims on appeal that he was deprived of a fair trial through the admission, following re-cross-examination of Sheridan, of his statements regarding other homicides.[21] In their direct case, the People initially introduced defendant’s statements pertaining only to the Matos killing and the Avenue D incidents. The trial court ultimately permitted the People to introduce defendant’s entire confession, including the statements about other homicides, to rebut the claim that defendant *417 falsely confessed in an unreliable interrogation to killing Matos to cover for his wife. The trial court explained that the jury needed to hear the entire confession to discern “the truthfulness of the [Matos] statement and the motivation for the defendant to give the various versions” of it. In our view, defendant, in the particular circumstances of this case, opened the door to this evidence.[22]
(i.) Pretrial Motion Practice
On July 31, 1998, more than three months before trial, the prosecution informed defense counsel by letter that it did not intend to offer testimony in its direct case regarding other murders “unless the door is opened through argument, cross-examination or presentation of evidence by the defendant.” The People warned that if defendant raised voluntariness claims “which in any way relate to what took place during the times the defendant was making statements regarding the Diaz, Toro or Holl[e]y murders,” they would seek to present rebuttal evidence concerning the interrogation as a whole.
In an August 10, 1998 letter in reply, defense counsel acknowledged:
“We recognize that redaction of evidence of the prior homicides necessarily creates gaps in the time-line of the interrogation. . . . Please be assured that we will not exploit these gaps by arguing to the jury that these gaps reflect the time when impermissible pressure was brought to bear upon [defendant].”
On August 31, 1998, defendant moved for a pretrial order redacting from his confession any reference to the other homicides. The People responded that for the first hour and three quarters of the interrogation, defendant spoke about four murders intertwined with his repeated request that police release his family. The People offered to structure their direct examination to eliminate all conversations regarding “the four bodies and the defendant’s demands to have his family released.” The prosecution again warned defendant against opening the door to his admissions through, for example, questions about time gaps in the confession or alleged promises made by police about his family’s release. The prosecution maintained that it would be unfair to require the investigators to answer *418 questions about any alleged promises without being able to explain to the jury “the entire substance of that conversation.”
After extensive oral argument, the court told defense counsel that many issues in the case could open the door to the full confession. To avoid that outcome, the trial court offered defense counsel the opportunity to submit a “wish list” of suggested redactions from the confession. The court additionally invited defense counsel to submit proposed questions for cross-examination, so that the court could, in advance, point out areas that might be in the danger zone. Plainly attentive to the potential for prejudice to defendant, the court stressed that the other statements could be relevant to issues in the case, requiring examination of the “prejudicial or probative value of the statements themselves.”
Despite the trial judge’s suggestion, defendant chose not to provide a list of proposed redactions. Thus, without benefit of a proposal from defense counsel, the court issued its pretrial order:
“The People . . . point out that during the time period that Inv. Sheridan and Sgt. Gropp spoke to the defendant, there was intertwined conversation regarding other issues dealing with the release of his family. . . . The prosecution, however, is concerned that the period of time taken up regarding the conversations on the Diaz, Toro and Holley murders may be raised by the defense on the issue of voluntariness on the Matos-Rodri[g]uez murder, which is the subject of this trial. The People wish to reserve the right to question the investigators on re-direct examination should the defense ‘open the door’ to an enlarged area of questioning.
“The Court is sensitive to the People’s request but feels there is no way to make a definitive order in advance of the trial on the People’s request. Therefore, it is the direction of the Court that the People should structure their direct examination regarding the conversations between the defendant and the police from 5:45 p.m. to 7:30 p.m. on November 7, 1996 [sic] in a way in which all conversations regarding references to ‘4 bodies’ and the defendant’s demand to have his family released are eliminated. The Court will allow leeway to the pros *419 ecution by way of leading questions on these issues. The Court will preserve the People’s right to challenge the defense cross-examination and to raise the issue as to whether the defendant has raised any issue as to the voluntariness of the statement relating to what took place during the times the defendant was making statements regarding the Diaz, Toro, and Holley murders.”[23]
(ii.) The Defense Strategy
Despite knowledge that the People were prohibited from eliciting the chronology of the confession or defendant’s demands to have his family released, and despite the trial court’s repeated warning that the preclusion order would be revisited based on what ensued at trial, the defense opened with its own theory explaining the Matos statement: that defendant was motivated to confess in an “obvious and elaborate ritual to cover for his wife.” In the opening, defense counsel told the jury that defendant’s statement “was nothing less than Mr. Mateo taking everything his wife did onto his shoulders.” Disregarding his own earlier assurance that he would not exploit the time gaps, counsel also urged the jurors to “pay close attention to the circumstances and chronology of the statements.”
Through the cross-examination of police witnesses, defendant’s strategy emerged. Questions about the extent of his leg injury, the timing of events in the interrogation and his concern for his family (which the People had been barred from explaining) began painting a picture that defendant, in significant pain throughout a very protracted nighttime interrogation, confessed to Matos’ murder in an unreliable manner. By contrast Sheridan, the People’s main witness on the Matos murder, testified in the truncated fashion directed by the pretrial order.
Sheridan testified that defendant first admitted to shooting Matos himself, then changed his story and claimed Monica did it, then went back and forth several times, and even claimed that Monica did it, but he would take the blame because he was a “king” and wanted the death penalty. After these various oral *420 admissions, defendant again asserted in his written statement that he pulled the trigger. By contrast, he never wavered from his assertions that he decided to execute Matos and that Monica was following his orders.
Sheridan also explained that after he completed taking the Matos statements, his partner Sergeant Gropp took defendant’s written statements about Avenue D. When the People finished their direct examination of Sheridan, the defense sought rulings from the trial court about eight areas of cross-examination of the investigator concerning: 1) the time gaps in the interrogation, 2) alleged promises that defendant’s family would be released, 3) alleged promises that police would reduce Victor’s charges, 4) alleged promises about Monica’s charges, 5) defendant’s concern for his family’s safety, 6) the substance of what defendant learned about Monica’s statements, 7) the substance of defendant’s taped telephone call to his mother (in which he said he “took four bodies”), and 8) defendant’s physical condition during the interrogation.
The trial court advised defense counsel that, in light of this plan of attack:
“I think that the redactions that have been agreed to up to this point by the People on the direct would not continue through the cross-examination. If I’m going to be telling the jury that in evaluating the testimony of Investigator Sheridan concerning the statement attributed to the defendant, one of the things I’d be telling them is they should be looking at the totality of the circumstances, everything that happened. And in this case, . . . the picture is a picture of a defendant who is attempting to take control of the interview process and asserting very vigorously conditions that he requires as conditions precedent to his talking to the officers from the moment of calling Investigator Sennett and telling him to get somebody in there to talk to him, setting conditions for his family’s release, setting conditions for what charges would be placed against his family, specifically Victor Cordero.”
The court agreed to allow defense counsel to ask general questions about the time gaps and defendant’s injury, but again warned that if counsel strayed into the areas of voluntariness and reliability, then the door would open to the entire confession. Defendant’s demands for the release of his family, the *421 court determined, were ongoing negotiations and their unveiling would open the door to the People’s rebuttal. Defense counsel could ask general questions about Victor’s role at Avenue D, but any questions about negotiations about either Victor’s or Monica’s charges would open the door to rebuttal. Indeed, the court reminded defense counsel that Monica had told investigators that defendant was responsible for “several other bodies.”
Inquiry about defendant’s meetings with Victor and Monica, the court concluded, would also require explaining defendant’s motivation for making admissions, and the jury would then need to consider the full circumstances of the confession to evaluate voluntariness and reliability.[24] The court again warned that if defense counsel was not careful, “the doors could fling open.”
On cross-examination, defense counsel quickly returned to the themes of the time gaps and defendant’s injury, reiterating that the interview began at 5:45 p.m., that a meeting with Victor took place at 8:00 p.m., and a second meeting with him was “much, much later,” and that defendant was limping. Cross-examination was then interrupted because defendant developed the flu. When the trial resumed, defense counsel asked for three more rulings. Specifically, counsel asked if he could cross-examine the investigator about: 1) defendant’s meeting with Monica, 2) defendant’s second meeting with Victor and 3) the phone call. The court repeated that the phone call was still off limits because of its reference to “four bodies,” but determined that the defense could ask generally about the meeting with Monica, although not its substance. The defense withdrew the request to ask about the second meeting with Victor, because during that conversation, defendant told Victor that he would take the rap for “these murders.” Yet immediately after those rulings, defense counsel asked Sheridan about the second meeting with Victor, and whether defendant had confided that “this stemmed from his personal relationship with Janette and Monica; is that correct? Was there anything of that nature discussed?” The investigator answered, “I don’t believe so.”
The defense also questioned Sheridan whether the written Matos statement was “typed out in a single session” or whether *422 there was a “break” before it was finished. Counsel persisted, asking, “But the narrative was done and then you asked him is there anything else you want to say? And then he added a final sentence or two?” The investigator responded, “Yes. That’s it.” Defense counsel additionally established that defendant added a second, handwritten addendum to that statement at approximately 2:00 a.m., more than eight hours after the interrogation began. He further elicited that defendant expressed concern for his family members “throughout” the interrogation.
Defense counsel completed cross-examination and offered to withdraw his request for a voluntariness instruction after the People argued that any such request would “open up the questioning of Investigator Sheridan to the entire contents of the interview” on redirect. The court asked defense counsel for clarification, noting that it had:
“some concerns about the questions that have been asked up to this point about the physical condition of the defendant, because it’s not asked presumably just to be out there. It’s asked to perhaps give the impression to the jury that Mr. Mateo was under such a physical disability because of the wound to his leg that he spoke with the officers. And certainly the time of the interview is left hanging here. The time of the statement being signed. And all that that [sic] goes to it. I think we’re asking the jury to speculate.”
Defense counsel claimed that he had “assiduously avoided reference to physical condition in my cross-examination” of Sheridan. The court, however, pointed out that “[everybody that had a passing view of your client was asked if he was limping or seemed to be bothered by a wounded leg.” Defense counsel then promised not to “get into the classic voluntariness issues.”
As for a truthfulness charge, the court observed:
“This issue about truthfulness of the statement, reliability of the statement, any issue that could be phrased to the jury as asking them to, members of the jury, try to read between the lines about what’s going on here, those are issues that I’m very concerned about, and I guess I want to alert all of you to that. If the defense is really withdrawing this *423 and that these issues are not going to be asked of Investigator Sheridan or any other officer, then I would expect they not be referenced either. Is that clear to everybody?
“[the people]: Yes, Your Honor.
“[defense counsel]: Yes, Your Honor.”
On redirect, the prosecutor posed a few questions about defendant ordering Monica and Victor to follow his commands, and about the decision to kill Matos. On re-cross, defense counsel asked about defendant’s assertion that he was “going to take the [ ]rap for this or take the blame for this.” Counsel asked whether Sheridan “pressed him on the matter” and finally, asked whether defendant stated it was “because he wanted [the] death penalty.” The prosecutor objected on the ground that the questions were beyond the scope of the redirect.
The court asked counsel to approach, and after a 15-minute recess in which it reviewed Sheridan’s report on the interrogation, observed:
“I think all of this goes to truthfulness of the statement and negotiations on the statement. If you are going to be arguing that to the jury, on the issue of whether the statement itself is truthful and the motivation for changes, this is what it’s about it seems to me. It is so interwoven, at least the setting of this police report, the way that it’s couched in this police report, it starts out from the moment the rights are read that Mr. Mateo is setting the agenda for how the statement is going to be taken, under what conditions, and even what subjects are going to be covered. I can understand, based on what your defense is—and I guess this is one of the things that we all talked about at various stages in the case— that we wouldn’t know until we were here completely what tenor the case would take. I understand also why you haven’t, up to this point, up to the requests for the charge, really indicated what it was that you were going to be saying at the trial, but now we are here and if there is an issue about the truthfulness of the statement and the motivation for the defendant to give the various versions that have been described by the witness, then I think it all comes in, the entire testimony about the other homicides, the contacts with the family, the belief *424 that others may have been informing on him, I think that all comes in. To say that it doesn’t, I think, again, asks the jury to determine the truthfulness of the statement without knowing what all the circumstances surrounding the taking of the statement were.”
The court concluded that defendant’s motivation for making the written statement “involved other criminal acts that he faced” and was interwoven with his desire to see that members of his family were released from police custody.[25] Aware of the potential prejudice to defendant, the court acknowledged that it would:
“inform the jury that the information concerning other homicides is not offered as an indication that the defendant committed this homicide for which he is charged or any of the crimes for which he is charged, but it’s offered on the issue of the truthfulness of the statement and what motivation, if any, Mr. Mateo may have had to alter his description of the events.”
Sheridan then testified concerning defendant’s full confession, followed by an instruction warning the jury that the testimony was admitted for “a very limited purpose.” The trial judge explained that the statements about other homicides were not to be considered as any indication of defendant’s propensity for committing crimes. Rather, the court charged, the jury should consider the probability or improbability of the Matos statements and what motivation, if any, defendant had to make them, and should reflect on the interrogation as a whole to assess the truthfulness of the Matos statements. In its final charge, the court repeated these instructions to the jury.
(iii.) Analysis
It is well settled that evidence is relevant if it has any “tendency in reason to prove any material fact” (People v Alvino, 71 NY2d 233, 241 [1987]). All relevant evidence is, moreover, admissible at trial unless barred by some exclusionary rule. Even where relevant evidence is admissible, it may still be excluded in the exercise of the trial court’s discretion if its *425 probative value is substantially outweighed by the potential for prejudice (People v Scarola, 71 NY2d 769, 777 [1988]). When a party “opens the door” during cross-examination to excluded evidence, the opponent may seek to admit the excluded evidence in order to explain, clarify and fully elicit the question that has been only partially exposed on cross-examination (see e.g. People v Rojas, 97 NY2d 32 [2001]; People v Regina, 19 NY2d 65, 78 [1966]).[26] “The ‘opening the door’ theory must necessarily be approached on a case-by-case basis” (People v Melendez, 55 NY2d 445, 452 [1982]).
There is no doubt that this interrogation, as a whole, was probative of a material issue in the case—defendant’s motive for confessing to the Matos murder—and could aid the jury in assessing the truthfulness of that portion of defendant’s confession. There is also no doubt that it was defendant himself who made his motive for confessing an issue in this case. Eschewing the court’s offer before trial commenced to make selective redactions from the statements, and to pre-approve areas for cross-examination, the defense knowingly embarked on a dangerous strategy that during trial was periodically revisited by the court and the parties, and ultimately went too far.
The defense, in its opening statement, argued that the jury should acquit defendant of first degree murder because he confessed, in a lie, to cover for his wife. Four areas of testimony then became troubling to the trial judge. First, after Sheridan’s direct testimony, the jury knew simply that defendant confessed to the killing of Matos. What was omitted were defendant’s stage-setting declarations that he would give the police “everything” in exchange for what he wanted. Second, the jury was left with the impression that defendant was interrogated *426 from 5:45 p.m. to 2:00 a.m. concerning one murder and the Avenue D incidents. During that time, he actually spoke at length about four murders as well as two brutal home invasions at Avenue D, intertwined with demands for the release of his family.
Third, as the trial court emphasized, the jury heard repeatedly that defendant had a bandaged leg wound and was limping. What was beyond the jury’s knowledge was the fact that, despite his injury, defendant refused offers of medical treatment because he insisted on first clearing up the four homicides.[27] Finally, having learned in the opening that defendant was motivated to confess in an “obvious and elaborate ritual to cover for his wife,” the jury heard that defendant and Monica were involved in one murder. It did not know that defendant also confessed to three murders having nothing to do with Monica. Nor did it know that Sheridan told defendant early on that Monica was facing serious charges and defendant did not care that she “had been caught” and would not be released.
Compounding the problem of the distorted picture before the jury was the defense tactic of claiming it had no intention of opening the door, then persistently nudging it ajar. Incrementally, it became apparent to the trial court that, for the jury to assess defendant’s claim that his admission to the murder of Matos was a lie, it had to view that statement in its extraordi *427 nary context. The final, withdrawn defense question—whether defendant claimed that he confessed because he wanted the death penalty—underscored for the court and highlighted for the jury the enigma of defendant’s motivation for confessing to the Matos murder: was it to cover for Monica, to get the death penalty, or something else?[28]
As the court well knew, but the jury did not, the People had been precluded from presenting defendant’s actual motivation for confessing—his belief that he could set the terms of his interrogation, claim responsibility for four murders and win his family’s release. The defense cannot, on one hand, claim that defendant is innocent of first degree murder and lied to cover for his wife, and on the other, abuse the preclusion order and bar the People from refuting that claim. In effect, “the defense converted the shield of the preclusion order into a sword by arguing that the People should not be allowed to supply” defendant’s true motive for confessing (Rojas, 97 NY2d at 39). In these unusual circumstances, the jury was entitled to decide whether the defense claims rang true in context.
At bottom, the Court divides over what amounts to a fundamental disagreement about the trial record in this case. For an appellate court, the best evidence of who said what is in the transcript and we therefore have quoted extensively from it in an effort to show how the issue regarding defendant’s statements developed during trial—the pivotal inquiry. One prominent example of our difference is the claim that it was the People, and not the defense, who “opened the door” (Smith dissent at 440, 441). In fact, Sheridan testified on direct on November 16 and 17, 1998 (record at 14626-14702), and we are unable to find—until defendant’s cross-examination—any testimony bringing out the fact that defendant confessed in an eight-hour interrogation, about the early morning hour when the interview ended, or about its chronology.
The trial court, of course, observed this evolution of the issue firsthand before making its ultimate ruling that the potential *428 for prejudice to defendant did not substantially outweigh the probative value of the full confession. This ruling was made not sua sponte, or in a vacuum, but after repeated admonitions to defense counsel, several quoted verbatim in this writing. To diminish the potential for prejudice, moreover, the court instructed the jury concerning the limited purpose for which the clarifying evidence was being admitted. Unlike the Rosenblatt dissent, we will not disregard the trial court’s “explicit emphasis twice, by cautionary instructions to the jury” that the full confession was introduced only so that the jury could consider the truthfulness of the Matos statement and defendant’s motivation for making it, and not as proof of the charged crimes (see People v Till, 87 NY2d 835, 837 [1995]).
Should the court have made a more circumscribed ruling, permitting introduction of the other statements in a redacted form to limit further the potential for prejudice? That surely seems a better option. Indeed, the court had given that option to the defense prior to trial, but the defense ignored it. At trial, when the court ruled the statements admissible, the defense never suggested—as both dissenters do today—that they be tailored so that Sheridan would merely testify that defendant had confessed to “other crimes.”[29] But even such a ruling might have left the jury to speculate about what “other crimes” would require an eight-hour confession, or be so compelling that they would motivate defendant to forgo medical treatment for a bullet wound.
Of course, “[t]here is no litmus paper test for determining when the probative value of the evidence outweighs its potential for prejudice” (People v Ventimiglia, 52 NY2d 350, 359 [1981]).[30] In Ventimiglia, we determined that “[important in the weighing process will ... be how the evidence comes into the case, *429 that is, whether at the instance of the People initially, or in rebuttal to a defense offered by defendant” {id. at 360).
Viewing the question of prejudice in the context of the trial, this was a case in which the other statements came in as rebuttal to the defense theory. As the trial court observed, “[t]his isn’t an identification case. This is a statements case” in which defendant’s guilt of intentional second degree murder was uncontested. By the time these statements were received in evidence, the jury had already heard the details of the Matos execution from defendant’s own words to Sheridan. Additionally, it heard uncontested evidence of defendant’s crimes at Avenue D, through the testimony of the people who actually fended him off. And it heard that he had confessed in a lie to protect Monica.
But the law had altered the landscape for the People by excluding probative evidence bearing on the truthfulness and reliability of defendant’s admission to the Matos killing, and defendant sought to exploit that pretrial ruling. In the tangible circumstances presented, where the main issue for the jury was whether defendant was guilty of second degree murder as an accomplice, or of intentional first degree murder as the shooter or commander, we hold that the trial court acted within the bounds of discretion in its ultimate conclusion—resolving the issue explicitly identified at the outset of the trial—that the probative value of the full confession was not substantially outweighed by its potential for prejudice to defendant.
Finally, six of us conclude that, on this record, the admissions about other crimes were probative of a material issue in the case, and that the door was opened by the defense, to one degree or another. All seven of us remain deeply committed to the just, faithful and equal application of the law, irrespective of guilt. In so doing, we need not examine the trial court’s ruling through the lens of what might have been one of several appropriate responses in the heat of trial. Rather, the result reached here rests on a succession of factors particular to this case, beginning with defendant’s staging of his statements to the police and the favorable pretrial order he procured, and ending with the skewed picture that his abuse of that order produced—in short, turning the protective shield into a sword. That was impermissible before this case, as it continues to be after.
As we concluded in Harris, despite the success of defendant’s Jackson challenge to his sentence (98 NY2d at 496-497), his conviction for first degree murder and the other offenses stands, *430 and we therefore affirm it. As a consequence, defendant’s remaining contentions regarding his sentence are academic.
Accordingly, the judgment of County Court should be modified by setting aside the sentence of death and remitting to County Court for resentencing in accordance with CPL 470.30 (5) (c) and Penal Law §§ 60.06 and 70.00 (5) and, as so modified, affirmed; the appeal from County Court’s order dated March 11, 1999 should be dismissed.
G.B. Smith, J. (dissenting). Defendant’s confessions to the murders of Johvanny Diaz, Joangel Toro and Peter Holley were improperly admitted at trial. The evidence had no relevance to any material issue in the Matos case and tended only to demonstrate defendant’s violent propensity. Nor did the defense open the door to the admission of those confessions. The evidence does not support the Court’s conclusion on this issue. The record illustrates that the defense did not raise any issue warranting the introduction of the confessions related to the three uncharged murders. The evidence therefore should have been excluded pursuant to People v Molineux (168 NY 264 [1901]) and its progeny. I therefore dissent and vote to reverse defendant’s conviction and remand for a new trial.
As an initial matter, as I have stated in other capital cases this Court has heard since the reinstatement of the death penalty, because the penalty of death is qualitatively different than any other type of sentence a court may impose, both in its severity and its finality, there is a heightened need for reliability (see Woodson v North Carolina, 428 US 280, 305 [1976] [plurality op]; see also Caldwell v Mississippi, 472 US 320, 340 [1985]; Beck v Alabama, 447 US 625, 638 [1980]; People v Harris, 98 NY2d 452, 497-506 [2002] [Smith, J., concurring in part and dissenting in part]; People v Cahill, 2 NY3d 14, 77 [2003] [Smith, J., concurring]). “Any error that increases the risk of an unwarranted conviction, which would bring the defendant a step closer to death, must be subject to the heightened reliability standard” (People v Harris, 98 NY2d at 503 [Smith, J., concurring in part and dissenting in part]; State v Martinez, 132 NM 32, 36, 43 P3d 1042, 1046 [2002] [“Because of the gravity and irrevocability of the death sentence, and the grave injustice that would accompany an erroneous execution, error in a capital case is more likely to rise to fundamental error than the same error in a non-capital case. In a capital case, a legal defense often represents the only lawful mechanism by which a defendant may preserve his or her life. Any error that encumbers *431 that mechanism unfairly debilitates the defendant’s claim to life, magnifies the risk of an erroneous execution, and necessarily constitutes a circumstance that shocks the conscience and implicates a fundamental unfairness within the system that would undermine judicial integrity if left unchecked” (citation and internal quotation marks omitted)]). Indeed, as this Court stated in Harris, “We are careful to note . . . that capital trial courts should exercise great caution in making discretionary determinations. . . . The stakes are high for all involved” (People v Harris, 98 NY2d at 490).
Responding to defendant’s appellate argument challenging the constitutionality of the death penalty based on the risk that an innocent person may be executed, the People argue, “Sometimes, despite all the steps taken by the Legislature and the Judiciary to assure that such mistakes are few and far between, human and institutional fallibility may result in a wrongful conviction. And even if it has not happened in the last thirty years and certainly will not happen here, it is possible that an actually innocent person will be someday executed.” Despite this observation, no judge or lawyer can accept the possibility of the conviction and execution of an innocent person. It is therefore imperative for the judiciary scrupulously to honor the defendant’s constitutional right to a fair trial and to apply carefully the evidentiary rules established for the protection of the innocent. In this case, however, even without regard to heightened scrutiny standards, the admission of evidence that defendant had committed three murders in addition to the crimes for which he already stood accused was clearly erroneous.
It should be clear that the difference between the majority and the dissent is not simply a different reading of the record. One difference is that the People never claimed that the defendant had opened the door to testimony concerning defendant’s confession to three unrelated murders and the trial court did not base its decision to allow that evidence on its conclusion that the defendant had opened the door, but the majority itself concludes that the defendant opened the door. The second difference is that the majority does not address the defendant’s main argument for moving for a mistrial and one of his contentions on this appeal, namely that the introduction of the testimony concerning three unrelated murders violated People v Molineux.
*432 A.
In addition to confessing to the two burglaries at the Avenue D apartment building and the murder of Juan Matos, defendant also told Detective Sheridan that he had killed Johvanny Diaz, Joangel Toro and Peter Holley. Describing the first two murders, defendant confessed that he and his cousin “Moncho” had been hired by a drug dealer named Charlie to shoot Johvanny Diaz in the knees and to steal his jewelry because Diaz owed Charlie money. Defendant and Moncho were to be paid $10,000 for the shooting. They looked for Diaz and found him on Jay Street. After they unsuccessfully attempted to purchase drugs from Diaz, he walked across the street to use a pay telephone. Joangel Toro approached Diaz while he was on the phone and stood near him. Defendant and Moncho then put nylon masks over their faces and walked over to Diaz. Moncho pointed a .45 caliber gun at Diaz. When Toro tried to walk away, defendant pointed a .38 caliber gun at him and forced him to return. Moncho then shot Diaz in the face, which prompted defendant to start shooting at Toro. After shooting at both victims numerous times, defendant and Moncho fled the scene.
Defendant then recounted to Detective Sheridan the murder of Peter Holley. According to defendant, his cousin had come to him and said that a man threatened him with a knife and stole his bicycle and jewelry. Defendant obtained a single-barrel shotgun and drove through the streets with his cousin to find the man. When they approached the area of the robbery, his cousin saw his bicycle on the side of the road. His cousin identified and pointed out Holley as the man who robbed him, exited the car and retrieved his bicycle. Defendant then drove up to Holley, who was trying to get into his own parked car, shot him in the head and drove away.
B.
Prior to trial, the prosecutor informed defense counsel that the People would not seek to introduce defendant’s confessions to the three uncharged killings unless the defense opened the door to the evidence. In particular, the prosecutor warned that he would seek the introduction of all of the defendant’s confessions if the defense challenged the voluntariness of the statements or sought to prove that defendant’s confessions were induced by promises made to him by the police. The prosecutor also noted that any attempts by the defense to exploit the gaps in the timing of the interrogation during which the admitted *433 confessions were obtained would open the door to the remainder of defendant’s confessions. Defendant’s attorney agreed to avoid those areas during his argument and in the course of the cross-examination of the People’s witnesses. Counsel, however, maintained that challenges to the truthfulness of defendant’s confessions regarding who actually shot Matos would not open the door to the additional murder confessions.
During his opening statement, defense counsel made no attempt to challenge the voluntariness of defendant’s confessions. As is relevant here, defense counsel argued that at the core of the case lay two questions: “Who did what? And why did they do it?” Counsel informed the jury that defendant “gave an oral and a written statement while interrogated by Investigator[s] Sheridan and Gropp.” He urged the jury to “pay close attention to the circumstances and chronology of the statements.” Counsel went on to argue that in his written statement, defendant attempted to take the blame for his wife’s actions because he felt responsible for Matos’s death. The prosecutor at no time suggested to the court that arguments made in defense counsel’s opening statement opened the door to defendant’s confessions concerning the three uncharged murders or that the disclosure of those confessions was warranted.
What the defendant indicated in the opening statement was that the defendant did not kill Matos and did not order his wife to do so. Thus his strategy, stated in the opening, was to blame Monica Szlekovics, his wife, for the murder and to prevent a conviction for first degree murder. He stated, “This killing, as tragic as it was, was at the unguided hands of Monica Szlekovics, a woman capable of acts of violence, especially when it involved a perceived threat with her relationship with Angel Mateo.”
Following the direct examination of Investigator Terrance Sheridan, the parties and the court discussed the areas which defense counsel intended to explore on cross-examination and the arguments he intended to advance based on the testimony. The court informed defense counsel that a challenge to the voluntariness of defendant’s confessions based on any alleged promises, as well as a challenge to the reliability of his confessions based on the fact that he had an injured leg at the time of the interrogation or due to some other exerted influence, would open the door to the evidence that he had confessed to the three uncharged murders. Based on the court’s ruling, counsel withdrew his previous request that the court give the jury an *434 instruction on the voluntariness or the reliability of defendant’s statements.[1]
At that point, counsel informed the court that he intended to challenge only the truthfulness of defendant’s confessions. When asked for clarification on this strategy, counsel explained:
“Whether the statement itself is a reliable rendition of what happened that night. It was taken down according to his wishes and it was not true in its ultimate.
“Your Honor, we have a dilemma where there’s an oral statement and a written statement that essentially contradict themselves as to an essential fact. One will be reliab[le], one will not be.”
The court then responded, “You know, we have an oral statement and a written statement that are contradictory to each other on their face.” The court nevertheless warned defense counsel that if he sought to explain the contradictions by way of arguments that challenge the voluntariness of the confessions or the reliability of his statements based on his injury, it would open the door to the other murder confessions.
During the cross-examination of Sheridan, defense counsel elicited that Sheridan took a written statement from defendant on the late evening of November 6, 1996 or early morning hours of November 7. Sheridan further testified that defendant met with his brother, Victor Cordero, at 8:00 p.m. and again at a later time in the evening.[2] Counsel also elicited that defendant’s second handwritten addendum to his written statement was made at 2:00 a.m. or possibly later.
*435 Following up on testimony educed during Sheridan’s direct examination, counsel also elicited that defendant had orally stated that his wife had shot Matos. Sheridan testified that defendant told him that when the time came for his confession to be committed to writing he intended to say that he was the one who shot Matos. Defendant said that he intended to take the blame for the shooting because he believed that the incident was entirely his fault and because he wanted the death penalty. According to Sheridan’s testimony, defendant stated that he would rather die than spend “a hundred years” in prison.
After defense counsel’s cross-examination of Sheridan, the People made no argument that counsel opened the door to the other statements and did not otherwise seek to introduce the remainder of defendant’s confessions. Neither did the court state that counsel’s questioning warranted the introduction of the other murder confessions. Defendant’s attorney assured the court that he intended to argue that defendant’s admission that he had pulled the trigger killing Matos was not true, but that he would not argue that the confession was involuntarily extracted.
Following a redirect examination and re-cross-examination of Investigator Sheridan on other matters, the prosecutor informed the court that he intended to conduct further redirect examination. At no time did the prosecutor argue that questions asked on re-cross-examination opened the door to defendant’s confessions regarding the three uncharged murders.
However, in a sua sponte ruling, the trial judge stated that any challenge to the truthfulness of defendant’s confessions and any argument as to the reasons that he altered his version of the Matos killing required the introduction of his statements regarding the three uncharged killings. The court reasoned that defendant’s references to all four killings were so intertwined that the jury’s assessment of the truthfulness of defendant’s statements must include the confessions to all of the killings. The court added that defendant’s statement that he would rather be sentenced to death than serve a hundred years in prison required the jury to be made aware of the other murders so that the statement would make sense.
Defense counsel vehemently objected to the introduction of the uncharged murders, noting that the only way to defend the *436 capital murder charge was to challenge the veracity of defendant’s confessions. The court nonetheless maintained that the jury needed to consider all of the confessions in order to evaluate the credibility of defendant’s rendition of the Matos killing.
The People conducted a further redirect examination of Sheridan, at which time he testified about defendant’s confessions to the additional killings and read to the jury defendant’s written statements which described each of the killings in full detail. Sheridan also testified regarding his independent investigation into the murders of Diaz and Toro. Specifically, Sheridan testified that on the morning of August 6, 1995, months before defendant’s confessions, he had been called to Jay Street where he saw the lifeless bodies of Diaz and Toro. They were lying on top of one another in a pool of blood at the base of a pay telephone with its receiver dangling off the hook. Diaz had been pistol whipped several times with a large caliber handgun and had sustained four gunshot wounds to his head and two to his upper body. Toro had been shot once in his head and twice in his upper body.
Following Sheridan’s testimony, the court gave a limiting instruction informing the jury that the evidence was not offered to show defendant’s propensity to commit the crimes charged in the indictment, but to illustrate the circumstances of the confessions so that the jurors could evaluate their credibility. The court subsequently instructed the jury not to consider the truthfulness of the other murder confessions. Thus the court allowed evidence of the prior murders not because defendant had opened the door but because of the trial court’s own conclusion that it was necessary to show whether the defendant was telling the truth in his confessions to the Matos killing.
Thereafter, in a written application, defendant moved for a mistrial based on the admission of the evidence of the three uncharged killings. Specifically, defendant argued that the other murder confessions should have been excluded under traditional Molineux principles because the evidence was not probative of any material issue in the case other than defendant’s propensity toward violent behavior. Defendant claimed that since he had already agreed not to challenge the voluntariness of his statements, the other murder confessions were not relevant to any issue related to voluntariness. He also argued that the evidence was not relevant to assess the truthfulness of his statements concerning the crimes charged. Defendant further argued that the prejudicial value of the evidence outweighed its probative effect.
*437 In response to the motion, the People argued that the admission of defendant’s other confessions was the result of extensive conferences with the court regarding the circumstances that would warrant the introduction of the evidence. The prosecutor argued that the evidence was probative of the voluntariness of defendant’s admitted statements and that it was necessary to refute the defense contention that he had given a false confession in order to secure his family’s release from jail.
In an oral decision, the trial court denied the motion, relying on its previous conclusions. The court stated that the evidence of the other murder confessions was relevant to address issues raised about the voluntariness and the truthfulness of defendant’s statements, especially as they related to promises made by the police and their negotiations with the defendant for his statements.
C.
It is fundamental that evidence concerning a defendant’s uncharged crimes or prior misconduct is not admissible if it cannot logically be connected to some specific material issue in the case, and tends only to demonstrate that the defendant was predisposed to commit the crime charged (see People v Hudy, 73 NY2d 40, 54 [1988]; People v Alvino, 71 NY2d 233, 253 [1987]; People v Ventimiglia, 52 NY2d 350, 359-360 [1981]; People v All-weiss, 48 NY2d 40, 46 [1979]). First pronounced by this Court in 1901 in People v Molineux (168 NY 264 [1901]), this evidentiary rule is widely recognized by state courts throughout this country and the federal courts have steadfastly adhered to it as codified by Federal Rules of Evidence rule 404 (b).[3] To be sure, long before our decision in Molineux, this rule, like many other *438 rules of evidence followed in this country, had its roots in 16th century England (see Joan L. Larsen, Of Propensity, Prejudice, and Plain Meaning: The Accused’s Use of Exculpatory Specific Acts Evidence and the Need to Amend Rule 404 (B), 87 Nw U L Rev 651, 667 [1993]; see also 1A Wigmore, Evidence § 58.2, at 1213-1214 [Tillers rev ed 1983]). As this Court has recently noted, the progeny of Molineux have preserved its basic foundation: “a criminal case should be tried on the facts and not on the basis of a defendant’s propensity to commit the crime charged” (People v Rojas, 97 NY2d at 36).
The evidence of a defendant’s prior bad acts is “objectionable not because it has no appreciable probative value but because it has too much. The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused’s guilt of the present charge” (1A Wigmore, Evidence § 58.2, at 1212; see also Michelson v United States, 335 US 469, 475-476 [1948]; People v Rojas, 97 NY2d at 36-37 [“propensity evidence invites a jury to misfocus, if not base its verdict, on a defendant’s prior crimes rather than on the evidence—or lack of evidence— relating to the case before it”]; People v Hudy, 73 NY2d at 55; People v Ventimiglia, 52 NY2d at 359; People v Allweiss, 48 NY2d at 46 [“The rule is based on policy and not on logic. It is *439 meant to eliminate the risk that a jury, not fully convinced of the defendant’s guilt of the crime charged may, nevertheless, find against him because his conduct generally merits punishment”]). Therefore, “[w]here . . . the evidence proves only criminal propensity and serves no other function in demonstrating defendant’s guilt of the crime charged, there is no legitimate basis for its admission. No degree of care, in assessing its value and possible prejudice and in giving cautionary instructions, can render it otherwise” (People v Alvino, 71 NY2d at 253).
Of course, evidence relevant to some material fact in the case, other than the defendant’s criminal propensities, is not to be excluded merely because the evidence may reveal that defendant had committed other crimes (see People v Ventimiglia, 52 NY2d at 359 [the rule’s “policy of protection against potential prejudice gives way when evidence of prior crime is probative of the crime now charged”]; People v Allweiss, 48 NY2d at 46-47). Thus, evidence of defendant’s uncharged crimes or bad acts may be admitted to demonstrate motive, intent, the absence of mistake or accident, identity or a common scheme or plan (see People v Molineux, 168 NY at 293). The list is merely illustrative and not exhaustive (see People v Rojas, 97 NY2d at 37; People v Ventimiglia, 52 NY2d at 359; People v Santarelli, 49 NY2d at 248). Relevant here, this Court has recognized that evidence of a defendant’s prior crimes may be introduced to refute a defendant’s claims at trial (see People v Alvino, 71 NY2d at 246; People v Ingram, 71 NY2d 474, 479-480 [1988]; People v Santarelli, 49 NY2d at 248).
Determination as to the admissibility of evidence of a defendant’s uncharged crimes or prior bad acts requires a two-part inquiry. First, the proponent of the evidence must identify some material issue, other than the defendant’s criminal propensity, to which the evidence is relevant (People v Hudy, 73 NY2d at 55; People v Alvino, 71 NY2d at 242). Second, the court must weigh the probative worth of the evidence against its potential for undue prejudice resulting to the defendant (People v Hudy, 73 NY2d at 55; People v Alvino, 71 NY2d at 242). Thus, “[i]f the evidence is actually of slight value when compared to the possible prejudice to the accused, it should not be admitted, even though it might technically relate to some fact to be proven” (People v Allweiss, 48 NY2d at 47).
Here, the majority concludes that defendant opened the door to the admission of his confessions to the three uncharged *440 murders. The evidence does not support this conclusion. The prosecutor did not argue at trial that the defendant had opened the door. And the court itself did not rule that defendant’s questioning of any witness had opened the door.
Both prior to and during the trial, the parties had discussed at some length the possible arguments defendant could make that would open the door to the remainder of defendant’s confessions. The prosecutor had maintained that if defense counsel sought to challenge the voluntariness of his statement, or exploit the time gaps in the interrogation or sought to show that the statement was unreliable because defendant suffered from a leg injury, the remainder of the statements would become relevant to refute those contentions. Defense counsel agreed not to exploit the gaps in the interrogation time-line and agreed not to challenge the voluntariness of defendant’s confessions.
Yet at no time following defense counsel’s opening statement or during his cross-examination of the People’s witnesses did the prosecutor ever claim that defense counsel had made an argument or sought to elicit any testimony to create a material issue in the case that could be answered by the introduction of defendant’s confessions to the uncharged murders. At the time the trial judge ruled the confessions admissible, the prosecutor had not noted any action taken that had opened the door to that evidence. That behavior is quite telling since a prosecutor would normally urge the trial court to introduce otherwise excluded evidence in order to refute arguments offered by the defense. Moreover, even at oral argument, when asked at what point during the trial defense counsel had opened the door, the People could offer no definitive answer.
The majority nevertheless agrees with the People’s argument, advanced for the first time on appeal, that defendant opened the door to the evidence by exploiting the unexplained gaps in the time-line of the interrogation. It is noteworthy that the trial court’s reasons for admitting the evidence of defendant’s uncharged crimes had nothing whatsoever to do with any purported exploitation of gaps in the time-line of defendant’s interrogation. Moreover, there is no evidence in the record to support that conclusion. Defense counsel’s remarks during his opening statement urging the jury to pay attention to the chronology of defendant’s statements, taken in context, appeared to be merely an attempt to alert the jury to the fact that defendant had initially claimed that his wife shot Matos, voiced his intent to change his story when the confession was to be *441 memorialized and then claimed to have shot Matos himself in the written statement. At no time did he attempt to make it appear that the police had subjected defendant to a drawn-out interrogation process in order to extract an involuntary confession from him. Importantly, defense counsel had withdrawn his request for a jury charge on the voluntariness of the confessions and repeatedly assured the court that he did not intend to make any arguments to that effect.
Nor did defense counsel attempt to extract a time-line of the interrogation from the prosecution witnesses. Indeed, prior to the testimony of Investigator Sheridan, it was the prosecutor who elicited from its witnesses the approximate times of their encounters with defendant. And it was the prosecutor who first elicited from Sheridan that he first came into contact with defendant at 5:45 p.m. During Sheridan’s cross-examination, defense counsel ascertained that defendant met with his brother at about 8:00 p.m. and again later in the evening. Sheridan also testified that at some point, defendant met with his wife. In addition, Sheridan testified that defendant made a second handwritten addendum to his statement concerning the Matos killing at approximately 2:00 a.m. However, not even these are indicative that defense counsel intended to exploit time gaps in the interrogation process to argue that defendant’s statements were involuntary. He never specifically called upon Sheridan to illuminate that the interrogation spanned eight hours. As defense counsel had explained to the court, those questions were intended to establish when he had written the addenda in relation to the two occasions when he met with his brother and in relation to when he met with his wife. Even the prosecutor agreed during a conference with the court that the use of the evidence for that purpose would not warrant the admission of the other confessions.[4]
Moreover, since defendant did not seek to challenge the voluntariness of his confession, it was not necessary for the prosecutor to account for the entire period of the interrogation. It was sufficient for the jury to know that defendant had given separate written and oral statements regarding the Matos kill *442 ing and the two home invasions at the Avenue D apartment building. It was also apparent from the record that defendant had taken breaks during the course of the interrogation process. Thus, it would have been clear to the jury that defendant had been interrogated about different crimes by various police officers. And since nothing in the defense counsel’s cross-examination suggested that the length of the interrogation suggested improper exertion on defendant which would affect the voluntariness or reliability of his confession, the door to the unrelated murder confessions was not opened.
Even had defense counsel sought to exploit the time gaps in the interrogation process, it still would not have justified the introduction of the details of defendant’s statements concerning the other murders. If the discrepancy in the timing of the interrogation became an issue, it would have been adequate to allow Investigator Sheridan to testify that the reason that defendant’s interrogation had extended into the next morning was because in addition to confessing to the crimes here, defendant had been providing the police with information regarding several unrelated open investigations. Since it would not have been necessary to delve into the specifics of the remainder of defendant’s statements, there was no reason to admit this evidence to explain any time gap in the interrogation.
Also in concluding that the defense opened the door to the confessions concerning the additional killings, the majority cites Sheridan’s testimony regarding the leg injury that defendant suffered from throughout the interrogation (majority op at 419, 422, 426). However, it was the People who introduced that evidence, not the defense. During the direct examination of Sheridan, the following exchange took place:
“Q. Before leaving the interview room, did you have any conversation with the defendant about his physical condition?
“A. Yes, we did.
“Q. What, if anything, did you ask the defendant and what, if anything, did he tell you about his condition?
“A. I asked him if he was injured and he said he was.
“Q. . . . Why did you ask him if he was injured?
*443 “A. Well, just in talking with him I could see that he was having, he was in a little bit of pain. He would wince from time to time. As I said before, I noticed he was limping, so—he was having some trouble with his leg, so I asked him if he was injured.
“Q. What did he tell you?
“A. He said he was and started to pull his pant leg up and I could see that there was a wound, or what I assumed was a wound, that was bandaged on his leg.
“Q. When you say bandaged, what did you actually see on his leg?
“A. I saw clean, white gauze wrapped around his shin area of his lower right leg.”
The prosecutor then introduced People’s exhibit 41, which was a photograph of defendant’s leg at the time of the interrogation. In the photograph, the gauze wrapped around defendant’s leg was visible.
The following exchange subsequently took place between the prosecutor and Sheridan:
“Q. What did the defendant do after he pulled his pant leg up?
“A. He started to unwrap the gauze to show me his injury, and I stopped him and I said, you know, just leave it alone. I—
“Q. Why did you do that?
“A. Well, it appeared to be pretty well wrapped up and I didn’t want to disturb it any further. The injury did not appear to be bleeding. There did appear to be some blood on the gauze but it was not bleeding at the time that I looked at it so I wanted it to stay in the condition that it was in at that time.
“Q. What happened when you told him not to unwrap it any more?
“A. He stopped unwrapping it and then he wrapped the gauze back around and put his pant leg back down.”
“Q. After he did that, did you have any other—well, did you ask him if he knew how that happened?
*444 “A. Yes, I did.
“Q. What did he tell you?
“A. He said he wasn’t sure. He said that it happened earlier that morning on Avenue D but he just wasn’t sure how he got hurt.
“Q. Did you ask him if he was shot?
“A. I did.
“Q. What did he tell you?
“A. He said he just wasn’t sure what it was. He said things happened so fast on Avenue D he just doesn’t know how he got injured.
“Q. So the only thing he told you definitely was that it happened that morning on Avenue D?
“A. Right.
“Q. Did you offer medical treatment at that point?
“A. Yes.
“Q. How did you do that?
“A. I asked him if he wanted to go to the hospital and get some treatment for it.
“Q. What did he tell you?
“A. He adamantly replied, no, he didn’t, he wanted to get this cleared up.
“Q. Up until that point what, if any, observations had you made of the defendant’s physical condition?
“A. He was alert, conscious, able to field the questions, intelligent. He was excited at times and he obviously, he was in slight discomfort from time to time but he didn’t want any medical treatment for it, and we had no difficulties communicating between the two of us.”
By contrast, defense counsel’s cross-examination of Sheridan regarding defendant’s leg injury consisted entirely of the following exchange:
“Q. And you accompanied Mr. Mateo from one inter *445 rogation room to the next to basically juggle positions with people in other rooms; is that right?
“A. Yes, it is.
“Q. And he was limping at that point, right?
“A. I believe he was.
“Q. Did you give him assistance or did you walk next to him or what?
“A. No. It wasn’t a real noticeable staggered limp. I could see he was limping slightly. Just an observation. But, no, I didn’t need to give him any physical assistance.”
It is unreasonable to conclude as the majority does that defense counsel’s questioning “creat[ed] the impression that the injury rendered the confession unreliable” (majority op at 426 n 27). If the door to the other murder confessions was opened based on the evidence of defendant’s leg injury, it was the People’s in-depth examination regarding the injury coupled with their introduction of the photograph depicting defendant’s bandaged leg that opened the door. Defense counsel’s limited questions about whether defendant had a limp surely could not be to blame. Having introduced the evidence themselves, the People should not thereafter complain that the excluded evidence should be admitted because of the possibility that the defendant might use it to argue that his statement was involuntary and unreliable, even though the defendant had not yet done so. If the People can circumvent an order excluding evidence of prior bad acts by introducing evidence that, if introduced by the defendant, would open the door to those prior bad acts, the Molineux rule would lose much of its potency.
It should also be noted that even if defendant’s leg injury would create the impression for the jury that defendant had been suffering throughout the interrogation and that it would affect the voluntariness of his statement, Sheridan’s testimony that he offered defendant medical assistance but defendant declined it and insisted on continuing the interrogation suffices in dispelling that impression.
The majority further states that because of the exclusion of the evidence of the other murder confessions the People had been barred from explaining why defendant had been concerned for his family throughout his interrogation (majority op at 419). That is not the case. The People elicited from Police Officer Di *446 Mascio (who testified before Sheridan) that defendant’s brother, Victor Cordero, was arrested along with defendant. Moreover, Sheridan testified on direct examination that when he first met defendant, he was in an interrogation room that was adjacent to one in which another of defendant’s brothers, Gilberto Gomez, was being held. Finally, Sheridan testified that defendant’s wife was also in custody at the time of defendant’s interrogation. This evidence was more than sufficient to explain why defendant would have been concerned for his family. Moreover, the prosecutor never claimed that questions that resulted in answers that defendant had expressed concerns for his family would open the door to the other murder confessions. On the contrary, during discussions with the court, the prosecutor stated, “In terms of a general question to the investigator, did the defendant express concern for his family, I think that type of a general question could be asked without opening the door to the other murder[s].”
The majority also concludes that defense counsel opened the door to defendant’s confessions to the uncharged murders by challenging the truthfulness of his confession of the Matos murder. However, in so concluding, the majority misconstrues the defense strategy. For example, the majority’s opinion suggests that defendant’s confessions to the Matos killing were essentially consistent, and that the defense had only the option of explaining why they should not be believed (i.e., because he was only trying to protect his family or because his power was overborne as a result of the long interrogation and the leg injury). This fails to account for that portion of Sheridan’s testimony in which he stated that defendant had originally claimed that Szlekovics shot Matos and then changed his story to claim that he had shot Matos. The majority also creates the impression that the only mention by defendant that he wanted the death penalty came during defense counsel’s re-cross-examination, at which time an objection to the question was sustained (majority op at 423, 427).[5] In fact, during the prosecutor’s direct examination of Sheridan, the following exchange took place:
“Q. Now, during the course of that conversation did *447 there come a time when you asked him further questions regarding who actually pulled the trigger and fired the shot that killed Mr. Matos?
“A. Yes.
“Q. What did you ask him?
“A. Well, at one point I looked Mr. Mateo right in the eye and I said, who really pulled the trigger in the basement—meaning the basement of the Saxton Street house—and he looked at me and he said why, and I said because I think Monica did it. . . .
“Q. What did he tell you?
“A. When I said I believe Monica did it, we believe Monica did it, he said she did. I couldn’t believe it. She is a crazy bitch, shot the guy. In other words, he didn’t expect her to pull the trigger. But he said he was at the top of the stairs and she shot the guy in the head, which surprised him.
“Q. So, at that time he told you he was at the top of the steps when Mr. Matos was shot?
“A. Right.
“Q. What did he tell you after that?
“A. He said, he said after he told me that Monica did it, he then said, but I’m going to say that I did it when I give you my statement.
“Q. Did you ask him about that?
“A. Sure. I said why. And he said, because I want the death penalty.
“Q. Did you ask him about that?
“A. Yes.
“Q. What did you ask him and what did he tell you?
“A. I simply said, why, why do you want the death penalty, and he said because he was—and he used the Spanish term which means king—he said, I’m a king and I can’t do a hundred years in jail. He said, I can’t take my life because I am a king so I want *448 the death penalty for this, and he also said because he deserved it.
“Q. During that conversation when he told you he was going to take the blame for it, did he tell you anything about whose fault he believed this was?
“A. Oh, he continually said that it was his fault for Sherer Street.”
Of course, on cross-examination, defense counsel followed on this testimony:
“Q. And essentially you looked him right in the eye and you said, ‘Who actually pulled the trigger’? Is that correct?
“A. Right.
“Q. And in response to that Mr. Mateo looked at you and said, ‘Why?’ Is that right?
“A. Yes.
“Q. And you in turn told him that you believed Monica did it?
“A. Yes.
“Q. And in response to that, Mr. Mateo indicated she did and that he couldn’t believe it. And that she was crazy. He couldn’t believe she shot him; is that right?
“A. Yes.
“Q. And he was at the top of the stairs when she shot him and didn’t even see her shoot him; is that correct?
“A. Right.
“Q. And it’s fair to say during this particular exchange when you looked Mr. Mateo right in the eye and you say who actually pulled the trigger, and he responds, his demeanor changed; is that right?
“A. Yes.
“Q. And it changed, it was different from what it was previous to this; is that correct?
*449 “A. Yes.
“Q. Now, after he indicates to you that he was surprised at this, he said I’m still going to take the blame for it, I’m going to take the [ ]rap for it; is that right?
“A. Yes, he did.
“Q. And you basically followed that up with why if she did it are you going to take the [ ]rap for it?
“A. That’s right.
“Q. And he indicated to you he’s going to take the [ ]rap for it because it’s his fault and he wants the death penalty; is that right?
“A. That’s right.
“Q. And you pretty much followed up on that: Well, why do you want the death penalty? Basically you followed up on that: Why do you want the death penalty? Is that correct?
“A. Yes.
“Q. He indicated, he used that Spanish term for king and he didn’t want to do a hundred years in prison, he’d rather die; is that right? Something along those lines?
“A. Yes. And that he deserved it and he couldn’t take his own life.
“Q. He also indicated to you that living in jail for a hundred years would hurt his mother too much?
“A. Yes.”
The importance of this testimony cannot be overstated for it is at the heart of the defense strategy. The majority mischaracterizes the defense as attempting to demonstrate that after being arrested, defendant discovered that his wife was a prime suspect in the Matos killing and then offered to implicate himself in order to protect her from prosecution. This, however, was not the actual strategy of the defense. The defense sought to establish, not why defendant confessed to the Matos killing in the first place but, given that defendant had offered conflicting accounts of who killed Matos, which account was true. The defense sought to establish that defendant’s oral statement that *450 his wife killed Matos and that it was a surprise to him was true, rather than his written statement in which he claimed to have shot Matos himself.
From his opening statement to the jury, defense counsel sought to show that defendant neither killed Matos nor ordered his wife to do so and that his wife acted on her own. Counsel’s emphasis on defendant’s admission that he was taking the blame for the killing because he felt responsible for it and wanted the death penalty was an attempt to demonstrate defendant’s motivation for changing his story, which would support the defense position that the oral statement should be believed over the written one.[6]
Had the defense been successful in convincing the jury that Szlekovics shot Matos and that it was a surprise to defendant (which would tend to disprove the People’s theory that he commanded her to kill), as he claimed during the oral confession, then he would have been convicted of only second-degree murder, but not first-degree murder. For the purpose of this strategy, it was not necessary for the jury to know that defendant had offered to tell the police about four murders in exchange for the release of his family from custody. The jury was not being called upon to decide what would motivate defendant to offer any confession at all. The defense was trying to persuade the jury only that the oral confession rather than the written one was the true account of the killing.6 [7]
The defense was perfectly entitled to pursue a strategy challenging the truthfulness of defendant’s confessions about the Matos killing without risking the introduction of the unrelated murder confessions. Regardless of defendant’s statements concerning the uncharged murders, there can be no question that defendant lied in his rendition of the murder of Juan Ma *451 tos. Defendant said that his wife shot Matos and expressed surprise that she had done so. He then said that when the time came for his statement to be committed to writing, he would say that it was he who shot Matos. When his statement was memorialized, defendant claimed to have been the shooter. Since the victim was shot only one time, defendant’s two versions of the killing in which he identified different shooters necessarily meant that he lied about the circumstances of the killing. Even the trial judge acknowledged that the contradiction was apparent on the face of the confessions. And by the People’s indictment against defendant, they acknowledge that because of defendant’s contradictory statements, not even they could determine the identity of the shooter. It was for this very reason that the People were forced to employ alternative theories for the killing—on the one hand arguing that defendant pulled the trigger, and on the other hand arguing that defendant’s wife killed Matos at defendant’s command.
Therefore, the real issue that the jury had to decide was whether defendant shot Matos; or his wife shot Matos at defendant’s command; or defendant’s wife shot Matos without having been commanded by defendant to do so. The evidence that defendant had also confessed to three additional murders could not possibly assist the jury in determining which of defendant’s versions of the Matos shooting was true. None of the other three murders was in any way related to Matos’s killing. They involved different dates, different accomplices and different motives. The evidence of defendant’s confession to the killings of Diaz, Toro and Holley was probative only of defendant’s propensity to kill and served no other function in demonstrating his guilt of the crimes charged here. Thus, there was no legitimate basis for its admission and it should have been excluded as a matter of law (see People v Hudy, 73 NY2d at 54).
That the evidence of the three uncharged murders was introduced in such a way as to demonstrate defendant’s proclivity to murderous behavior was apparent by the manner in which the evidence was introduced. In addition to permitting Sheridan to testify about defendant’s confessions detailing the circumstances of the other murders and to read the written statements to the jury, he was permitted to testify in detail about his own investigation into the murders of two of the victims. Sheridan told the jury that on the day after the murders (which took place months before defendant confessed to them), he had gone to the murder scene and discovered the bodies of Diaz and Toro. *452 Sheridan described the positions of their bodies and testified to their numerous gunshot wounds and injuries. There was no proper basis for the admission of testimony regarding Sheridan’s independent investigation into the uncharged murders. It was not germane to any issue to be decided in this case but rather was an apparent attempt to establish defendant’s guilt in the deaths of Diaz and Toro. The only possible reason for making such a showing would be to establish defendant’s propensity to kill. As such, there was no legitimate basis for the admission of this evidence, and its admission constituted error (see People v Hudy, 73 NY2d at 54).
It is also necessary to recognize that even if the confessions to the uncharged murders were probative of defendant’s contradictory confessions to the Matos killing, their probative value was necessarily hindered by the trial judge’s jury instructions. On the one hand, the trial judge told the jurors that the uncharged murder confessions were admissible only to allow them to assess the truthfulness of defendant’s statement regarding the Matos killing. On the other hand, the court instructed them not to consider the truthfulness of the statements concerning the other murders. Such an instruction frustrates the purpose of admitting the evidence in the first place. If the jury is not to rely on the confessions as being true, it cannot possibly use them to assess the truthfulness of defendant’s confession regarding the Matos killing. The evidence of the uncharged murders could provide a useable measure of credibility only if the jury could rely on its credibility. The court’s instruction disavowed the evidence even for this purpose. As such, there was plainly no use for this evidence other than to show defendant’s propensity to commit the crimes charged.
Although the majority downplays the prejudice flowing to defendant from the introduction of his confessions to the three uncharged murders, the prejudice here was overwhelming. It is difficult to imagine what could be more prejudicial to a defendant in a capital murder trial than evidence that on separate occasions he had killed three people in addition to the person he stands accused of killing. It is likewise difficult to imagine that a jury could possibly avoid using the evidence of defendant’s uncharged crimes, for which he had yet to be brought to justice, to conclude that he had such a violent character that he likely committed the crimes charged. After all, the jury learned that defendant was a hired gun for a drug dealer and had killed to avenge the theft of a bicycle. It is certainly doubtful that the *453 jury could have avoided the conclusion that defendant was just the type of person who would have killed Juan Matos and committed the crimes at the Avenue D apartment building.
Under the circumstances presented here, the risk of unfair prejudice flowing from the introduction of this evidence substantially outweighed its probative value. That defendant challenged the truthfulness of his confession in no way tipped the scales in favor of introduction of the evidence, especially since defendant offered contradictory accounts of who killed Matos.
The majority concludes that the jury would not have been unduly prejudiced by the evidence of defendant’s additional murder confessions because of the evidence of his crimes at the Avenue D apartment building and the Matos killing. Defendant faced a possible death sentence upon a first-degree murder conviction for the Matos killing. The defense theory of the case was that Szlekovics had killed Matos without having been commanded to do so and that therefore defendant should be convicted of second-degree rather than first-degree murder. Importantly, the difference between the degree of conviction defendant would receive rested primarily on which version of his confession to the Matos killing the jury believed. The evidence that defendant had killed three other people in addition to Matos could not possibly help the jury to determine whether defendant’s oral or written confession to the Matos murder was true. But alerting the jury that defendant had actually killed not one but four people created an unjustifiable risk that the jury would convict him for the highest possible degree of murder because his murderous behavior generally warrants punishment (see People v Molineux, 168 NY at 292 [other crimes evidence “would lead to convictions, upon the particular charge made, by proof of other acts in no way connected with it, and to uniting evidence of several offenses to produce conviction for a single one,” quoting Coleman v People, 55 NY 81, 90 (1873)]). Significantly, in this case, there was no mechanism available by which the jury could otherwise hold defendant accountable for those three additional murders. By contrast, the jury had the power to punish him for the Avenue D home invasions by convicting him.
As Chief Judge Cardozo aptly noted, “[i]f a murderous propensity may be proved against a defendant as one of the tokens of his guilt, a rule of criminal evidence, long believed to be of fundamental importance for the protection of the innocent, *454 must be first declared away” (People v Zackowitz, 254 NY 192, 197 [1930]). The evidentiary rule set forth in Molineux is the law of this state. As such, it must be applied equally—even to the most unworthy of defendants, and even if it means the toil of a retrial.
To be sure, an assignment of error to the introduction of defendant’s confessions to three uncharged murders would necessitate a reversal of his conviction and a new trial on all charges. But justice requires that we faithfully apply the law to the facts of the case before us. Many decades ago, Judge Fuld, writing for this Court declared, “Vicious though the crime was, convincing though the evidence of guilt may seem to be, we could affirm only if we were to announce a doctrine that the fundamentals of a fair trial need not be respected if there is proof in the record to persuade us of defendant’s guilt. We are not prepared to announce such a doctrine” (People v Mleczko, 298 NY 153, 163 [1948]). The introduction of the confessions to three murders unrelated to the crimes for which defendant was on trial deprived him of a fair trial.
Because the trial court’s admission of defendant’s confessions regarding three uncharged murders was in direct violation of the Molineux rule, I dissent from the majority and vote to reverse defendant’s conviction and to remand the case for a new trial.

. On January 17, 1997, the People filed notice of their intent to seek the death penalty pursuant to CPL 250.40 (2).

. CPL 220.10 (5) (e); 220.30 (3) (b) (vii).

. During an eight-hour interrogation beginning at 5:45 P.M. on November 6, 1996, defendant made a lengthy confession to the Matos murder, three other homicides and the Avenue D incidents. Those admissions were subsequently reduced to written statements, signed by defendant, about each crime. Our later references to the “confession” are to defendant’s statements during the interrogation in their entirety.

. On November 12, 1998, the People filed an amended trial indictment that eliminated the counts pertaining to the three other murders. Count 10 of the original indictment was renumbered count 5 for trial. In addition, defendant was indicted on three counts of second degree kidnapping for the home invasion on October 11, 1996 (counts 1-3). He was charged with second degree felony murder for the killing of Matos (count 6) and first degree kidnapping for the abduction of Matos (count 7). In connection with the home invasion on November 6, 1996, he was indicted on attempted first degree murder in the course of and in furtherance of a burglary (count 8), kidnapping in the second degree (count 9), first degree burglary (count 10) and first degree assault (count 11). He also faced two counts of third degree criminal possession of a weapon for possessing firearms on October 11, 1996 and November 6, 1996 (counts 4, 12). The jury found defendant guilty on all 12 counts.

. Defendant also filed an amended notice of appeal dated April 13, 1999, which sought to appeal from the judgment and, in addition, from County Court’s March 11, 1999 order denying his renewed CPL 330.30 motion. The appeal from County Court’s order should be dismissed because the order is not directly appealable to this Court under CPL 450.70.

. We note that defendant raises not a single challenge to the trial court’s rulings related to the two-month jury selection process.

. Monica’s jury also heard that she had previously blamed defendant for shooting Matos.

. The first degree kidnapping statute, Penal Law § 135.25 (3), provides that a person is guilty of that crime when he or she abducts another person who dies during the abduction or before being able to return or to be returned to safety.

. See Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 125.27, at 390.

. Prior to trial, defendant moved to dismiss the first degree murder count as duplicitous because it charged him with the killing as the shooter and as the commander of another person. While defendant no longer presses his claim of duplicitous counts on appeal, the trial court’s reasoning is persuasive on the issue before us:
“[t]he language ‘commanded another person’ is not an additional element to the offense of an intentional killing in the course of and in furtherance of a felony. Rather, under this statute, the People may charge the defendant as a principal, or in a limited situation, as an accomplice” (175 Mise 2d at 207).

. Before the case was submitted to the jury, defendant requested that the court instruct the jury that, to find him guilty, it had to be unanimous as to whether he shot and killed Matos, or commanded his wife to do so. The trial court rejected defendant’s request, and instructed the jury that:
“Your verdict, as I have mentioned before on each of these charges, has to be unanimous. That means all twelve have to agree upon a verdict. All twelve of you[ ] deliberating on a case do not have to agree that the Defendant was the shooter nor do all twelve deliberating on the case have to find that the Defendant was the commander. It is sufficient that all twelve find the Defendant was either the shooter or the commander under Murder in the First Degree.”

. We reject as meritless defendant’s contention that the trial court erred in instructing the jury on the definition of “command.” Indeed, in Couser, we cited with approval the trial court’s definition in Mateo (94 NY2d at 636-637).

. Schad itself cited People v Sullivan (173 NY 122 [1903]) as the leading case for the proposition that the jury need not necessarily concur in a single view of the transaction, in order to reach a verdict (501 US at 641). There, a single crime was charged in the indictment, first degree murder, under then-existing Penal Code § 183. As the Court explained, “[i]f the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation and part upon the other” (173 NY at 127, quoting Murray v New York Life Ins. Co., 96 NY 614, 622 [1884]).

. In light of this conclusion, we also reject defendant’s contention that the jury verdict was unreliable in that it did not enable him to know which theory to mitigate at sentencing.

. Contrary to defendant’s assertions, the reasonable doubt charge here conveyed the proper standard.

. After the jury sent a note asking for the medical examiner’s testimony on the cause of death, defendant asked the court to “instruct the jury that the indictment has charged [defendant] with causing the death by shooting or commanding another to shoot the victim with a gun and that is the only cause of death that has been alleged.” On appeal, defendant contends that the court was required to instruct the jury not to consider a suffocation theory of murder. This claim is not preserved, and in any event, without merit. The evidence in the case did not support the suffocation theory, nor was it charged or argued by the prosecutor. The court’s main charge referred to “shoot” or “shooting” no less than nine times.

. In his statements to police, defendant described the materials used to wrap the body, including curtains and a green blanket. Investigators corroborated these details when the body was found.

. We reject defendant’s claim that information provided by an informant in a search warrant application was unreliable.

. During the interrogation, defendant admitted his involvement in the double homicide of Diaz and Joangel Toro.

. At trial, the People must prove the voluntariness of a confession beyond a reasonable doubt (Anderson, 42 NY2d at 38-39) when that issue is properly raised by the defense. For voluntariness to be submitted to the jury, there must be a proper objection and an offer of evidence sufficient to raise a factual dispute (People v Cefaro, 23 NY2d 283, 286-287 [1968]). Defendant submitted a written request to charge involuntariness conditioned upon his own introduction of evidence showing involuntariness. He subsequently withdrew his request on the record, as a matter of strategy, and never renewed it at the charge conference. Thus, he failed to place the voluntariness question before the jury {id. at 288-289).

. Defendant couched his objection to the trial court solely in terms of an evidentiary error.

. Defendant’s other claims of evidentiary error, pertaining to the admission of the Avenue D incidents and his abuse of Janette Sanchez, and the exclusion of a taped telephone call to his mother, are also without merit.

. In his dissent, Judge G.B. Smith acknowledges the trial court’s conclusion that “evidence of the other murder confessions was relevant to address issues raised about the voluntariness and the truthfulness of defendant’s statements, especially as they related to promises made by the police and their negotiations with the defendant” (Smith dissent at 437). While Judge Smith disagrees with that conclusion, the trial court manifestly had a reason for drawing it other than to “demonstrate that the defendant was predisposed to commit the crime charged” (Smith dissent at 437).

. Defendant’s telephone call to his mother was not part of his confession, but occurred afterward. The trial court precluded cross-examination about it because of defendant’s admission to “four bodies.”

. At that point in the proceedings, defendant’s belated offer to withdraw his request for a truthfulness charge on the question of defendant’s motives for confessing, after sharply focusing on that question, was an empty one, as the People argued and the trial court concluded.

. While the Smith dissent rests entirely on People v Molineux (168 NY 264 [1901]), that was never the argument of the defense at trial, or its objection to admission of the statements, or the basis for the trial court’s ruling. Indeed, defendant’s mistrial motion, made several days after the statements were received in evidence, recognized that the ruling was based solely on the defense having opened the door. We note, moreover, that the evidentiary rule concerning “door-opening” is at least as venerable as the rule excluding prior bad acts (see e.g. People v Buchanan, 145 NY 1, 23-24 [1895] [acknowledging defendant opened the door, in first degree murder prosecution, to hearsay conversation between witness and coroner to rebut suggested inference concerning the motives of the testifying witness]).
Nor is defendant’s current contention that the trial court dropped a “surprise, mid-trial decision” on defense counsel supported by the record. From day one, counsel was repeatedly warned that overstepping the preclusion order could open the door to defendant’s full confession.

. True, Sheridan had testified on the People’s direct case that defendant’s leg was wounded and he was offered medical treatment but refused. The trial court ordered limited cross-examination about the injury:
“If the testimony and evidence of the physical condition of the defendant is argued to the jury as being relevant on the issue of voluntariness of the statement and reliability of the statement, then clearly evidence of the defendant’s ability to assert himself, to control the circumstances or attempt to control the circumstances under which the statements were made, to control the circumstances under which the interrogation took place, setting the conditions for that interrogation, for verification of those conditions that had been agreed upon, all those go to his state of mind, his ability to think, perceive, react, and as such all bear on the issue of reliability and voluntariness.”
We disagree that, in these circumstances, we are creating a new rule that “the People can circumvent an order excluding evidence of prior bad acts by introducing evidence that, if introduced by the defendant would open the door to those prior bad acts” (Smith dissent at 445). Rather, the defense was explicitly told that it could ask general questions about the injury but if it went further, creating the impression that the injury rendered the confession unreliable, it did so upon peril of opening the door to proof of what actually happened during the interrogation. As the trial court concluded, defense counsel’s repeated emphasis on the injury, as part of the false picture before the jury, crossed the line that had been drawn.

. Judge Smith maintains that “[t]he jury was not being called upon to decide what would motivate defendant to offer any confession at all. The defense was trying to persuade the jury only that the oral confession rather than the written one was the true account of the killing” (Smith dissent at 450). Yet in claiming the written statement a lie, defendant explained it away in another lie—that he confessed to cover for Monica. The jury was thus called upon by defendant to examine why he confessed and the People were permitted to answer that question with proof that he admitted not one but four murders, not for Monica, but to achieve the release of his family.

. Nor, surprisingly, did defense counsel say anything when the prosecutor elicited from Sheridan details corroborative of the other homicides.

. Ventimiglia did not involve door-opening, but an application of the rule against admitting prior crimes to show propensity. As these concepts are often related, the reasoning of Ventimiglia is instructive (see Rojas, 97 NY2d at 38). In Ventimiglia, moreover, we concluded that “[wjhere defendants charged with murder, kidnapping and conspiracy have stated as part of their planning that they have a place for disposing of the body ‘where we put people . . . and they haven’t found them for weeks and months’, the statement is admissible because its probative value as to premeditation of the murder and as to the plan of the conspiracy outweighs the prejudice resulting from the admission implicit in the statement that defendants have committed prior murders” (id. at 355-356).

. It is important to note that regardless of what rulings defense counsel sought before conducting Sheridan’s cross-examination, all that matters is what was educed during testimony before the jury. For that reason, for the purpose of this analysis, it matters not at all that counsel asked to inquire about alleged promises that defendant’s family would be released or alleged promises that the police made regarding Monica’s or Victor’s charges or the substance of what defendant learned about Monica’s statements or the substance of defendant’s telephone conversation with his mother. Counsel’s requests to inquire into all of those subjects were denied and counsel fully complied with the trial court’s ruling.

. The majority suggests that defense counsel’s questioning about defendant’s meeting with his brother was inappropriate (majority op at 421). However, limited questioning about whether defendant told his brother that the Matos incident and the home invasions “stemmed from his personal relationship with Janette and Monica” was proper, particularly given that during Sheridan’s direct examination, the prosecutor established that Sheridan had arranged a second meeting with Victor at which time defendant told Victor *435 that he had confessed to the police, apologized for involving him in his crimes and said that Victor would have to testify against him.

. Contrary to the position of the majority and Judge Rosenblatt, this case does implicate People v Molineux (see majority op at 425 n 26; dissenting op at 455). The issue here regards the admissibility of evidence that defendant had committed three murders which are not charged in this capital murder case. The Molineux rule deals with just this type of evidence of prior bad acts and requires that it be excluded unless it is probative of a material issue other than the defendant’s criminal propensities, and its probative value outweighs its risk of prejudice to the defendant. Thus, it is the traditional Molineux principle that excludes this evidence in the first instance. The prosecutor never noticed the other murder confessions as Molineux evidence during the pretrial proceedings because he had assured defense counsel in a letter that he would not seek to introduce the confessions unless defendant made them an issue at trial (one of the exceptions to the Molineux rule). But regardless of how the arguments were framed before the trial court, the conferences between the parties had all the earmarks of a Ventimiglia hearing, a progeny of *438 Molineux, whereby the defense sought to obtain an advance ruling from the judge prohibiting the introduction of prejudicial testimony regarding defendant’s prior criminal behavior. Furthermore, in his motion for a mistrial based on the introduction of the other murder confessions, defendant relied entirely on Molineux. Generally speaking, evidence that would otherwise be excluded under Molineux may be admitted where the evidence is probative of a material fact in the case being prosecuted. A material issue for which the evidence is probative does not necessarily have to arise in the People’s direct case. Such an issue can arise as a result of defendant’s testimony or an interposed defense. That circumstance would present an exception to the exclusion of the evidence pursuant to Molineux (see e.g. People v Santarelli, 49 NY2d 241, 247-248 [1980] [evidence of defendant’s past crimes relevant to rebut insanity defense]; People v Calvano, 30 NY2d 199, 205-206 [1972]; People v Alvino, 71 NY2d at 246-247 [evidence of prior drug sales admissible to rebut defendant’s testimony that he did not sell drugs and that he possessed 21 glassines of cocaine for his own personal use]). Finally, it is not my position that “door opening” by the defense is not a valid reason to introduce evidence of prior bad acts. Indeed, this Court has said as much in People v Rojas (97 NY2d 32 [2001]). It is my position, however, that a fair reading of the record reveals that the defense did not open the door in this case and that therefore, the confessions should have remained excluded pursuant to the Molineux rule.

. Contrary to the majority’s view (majority op at 427), it is not my contention that the People opened the door to a time-line by eliciting testimony that defendant confessed in an eight-hour interrogation or that his interview concluded in the early morning hours. But the People did first establish the time of the start of defendant’s interrogation. It is my contention that the People opened the door with respect to defendant’s leg injury.

. Contrary to the majority’s assertion (majority op at 427), defendant never said that he was confessing because he wanted the death penalty. Rather, he said that he was changing his story about the Matos killing and taking the blame for it because he wanted the death penalty.

. According to the majority, the defense tried to convince the jury that he had changed his account of the Matos killing in order to protect his wife from prosecution (majority op at 427 n 28). In fact, defense counsel sought to show that defendant’s motivation for changing his story was apparent from his statement to the police that he would take the blame for the murder his wife committed, not out of a desire to protect her, but rather to ensure that he received the death penalty. Evidence that defendant had confessed to three uncharged murders does not refute this argument, but rather supports it. Undoubtedly, from defendant’s perspective, the more murders to which he confessed, the more likely that he would receive capital punishment. Thus, the door to the other murder confessions was not opened by this argument.

. It is for this reason that I disagree with Judge Rosenblatt’s assessment that defendant tried to “create a false impression about the nature of his confession” and thereby opened the door if only slightly (dissenting op at 456).