(July 28, 2005)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALLEN JOHNSON, Appellant. [799 NYS2d 276]—

Spain, J. Appeal from a judgment of the County Court of Albany County (Breslin, J.), rendered August 11, 1999, upon a verdict convicting defendant of the crimes of murder in the first degree and burglary in the first degree.

The testimony at defendant's trial established that Anthony Ingoldsby, the victim of the crimes of which defendant stands convicted, lived in a basement apartment at 51 Elberon Place in the City of Albany with two roommates, Georgie Cruz and Victor Swarez. On July 28, 1996, when Ingoldsby was not home, defendant arrived at the apartment and delivered approximately $180 worth of heroin to Cruz, with the understanding that defendant would return the following day for his money. The next day, defendant returned in a vehicle operated by a girlfriend, Rene Rosano, who remained in the car, waiting for defendant. After questioning some individuals outside the apartment, defendant left and returned a second time, again with Rosano driving. Defendant exited the car and spoke with a neighbor, telling him that he was looking for his money, that he would "come for a dollar if it [was] his" and if he did not get it he would "take it in blood." After defendant left again, the neighbor warned Ingoldsby and Swarez that they should leave the apartment. Although Swarez heeded the neighbor's advice and left the apartment to stay with a friend, Ingoldsby did not, and was at home when defendant returned the third—and final—time that evening.

On the third visit defendant had engaged three other men—James McDaniels, Sean Payton and Roy Waterman—to accompany him back to the apartment explaining that someone owed him money and he wanted their help to "beat the guy up and get the money." Rosano drove the four men to the apartment, once again remaining in the car. According to the testimony of McDaniels and Payton, the men knocked on the door and when Ingoldsby answered, defendant grabbed him by the throat, forcibly entered the apartment, demanded to know where Cruz was and began to fight with Ingoldsby. The other men also entered the apartment without permission and kicked Ingoldsby when he fell down but, eventually, defendant and Ingoldsby ended up alone in a bedroom. The door was closed but the other men could hear loud "booming" noises, as well as defendant demanding to know where Cruz was and Ingoldsby

crying and begging defendant to stop. At some point, Payton broke into the bedroom by slamming his shoulder into the door and observed Ingoldsby "bleeding a lot . . . [f]rom his neck and his shoulders." Payton grabbed defendant and told him they should leave. Payton, McDaniels and Waterman then exited the apartment and got back into Rosano's car. Defendant followed a minute or so later, climbed into the front passenger seat and, according to McDaniels, stated that he had "busted the kid's shit in the house." Rosano described defendant as having "blood all over him." Rosano dropped the men off and they then went their separate ways.

Ingoldsby's body was discovered the following morning with multiple stab wounds to the neck, shoulder and chest, as well as other injuries. When Rosano learned of the murder on the news, she checked her car and found blood on both passenger side door handles of her car. That day defendant told McDaniels that he had "boated the big man on Elberon Street," which McDaniels understood to mean that defendant had stabbed the victim. At another point that day, defendant told Payton that "[t]he guy might have clunked out from last night."

At the crime scene, a police officer learned from the neighbor to whom defendant had spoken the night before that defendant had threatened the occupants of the apartment. The neighbor knew who defendant was and was able to identify him from a photo line-up. Defendant—who had an outstanding warrant for his arrest—was located and arrested. The three male accomplices were also arrested. McDaniels ultimately pleaded guilty to burglary in the first degree and was sentenced to 6½ to 12 years in prison in exchange for his testimony against defendant. Payton also accepted a plea bargain by which he pleaded guilty to burglary in the first degree, testified against defendant and was sentenced to 8 to 16 years in prison. Defendant was convicted by a jury of murder in the first degree and burglary in the first degree and was sentenced, respectively, to life without parole and 25 years in prison. Defendant appeals and we now affirm.

Defendant's primary contentions on appeal are that his burglary and murder convictions were not supported by legally sufficient evidence and were against the weight of the evidence. "A person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein, and when, in effecting entry or while in the dwelling . . . he or another participant in the crime . . . [c]auses physical injury to any person who is not a participant in the crime" (Penal Law § 140.30 [2]). Defendant argues on ap-

peal that the evidence does not demonstrate that he entered the apartment unlawfully with the intent to commit a crime. To the contrary, we find that "there is [a] valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial" (*People v Bleakley*, 69 NY2d 490, 495 [1987]). Both Payton and McDaniels gave consistent testimony describing the entrance into the apartment as forcible and without permission. Further, defendant announced his intention of extracting the money owed to him by force, first to the neighbor and later to his accomplices. Thus, we find defendant's burglary in the first degree conviction to be supported by legally sufficient evidence (*see People v Cancer*, 16 AD3d 835, 837-838 [2005]; *People v Hargett*, 11 AD3d 812, 813-814 [2004], *lv denied* 4 NY3d 744 [2004]; *People v Holmes*, 9 AD3d 689, 691 [2004], *lv denied* 3 NY3d 675 [2004]; *People v Goldsmith*, 127 AD2d 293, 295-296 [1987], *lv denied* 70 NY2d 711 [1987]). Moreover, no evidence was presented which directly rebuts the evidence that defendant forced his way into the apartment with the intent to assault its occupants and forcibly obtain payment from Cruz. Thus, after " 'weigh[ing] the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony,' " we find that the burglary conviction is not against the weight of the credible evidence adduced at trial (*People v Bleakley, supra* at 495, quoting *People ex rel. MacCracken v Miller*, 291 NY 55, 62 [1943]).

"A person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person . . . and . . . the victim was killed while the defendant was in the course of committing or attempting to commit and in furtherance of . . . burglary in the first degree" (Penal Law § 125.27 [1] [a] [vii]). Having found ample evidence in the record that defendant committed the crime of burglary in the first degree, we likewise conclude that the People set forth legally sufficient evidence to establish that defendant intentionally caused the death of Ingoldsby while in the course of committing said burglary. The evidence at trial established that Ingoldsby was stabbed seven times, as well as suffering other injuries from being beaten and cut. The fatal wound was determined to be a stab wound to his chest, inflicted by a knife, which was left at the scene of the crime. Ingoldsby's blood was found on defendant's shoes and, the day after the crime, defendant boasted of stabbing and possibly killing Ingoldsby. This evidence, combined with the testimony establishing defendant's motive, his expressed intention of doing violence to recover his money, the eyewitness account of his physical attack on

Ingoldsby and the testimony placing defendant alone in the room with Ingoldsby while Ingoldsby could be heard crying and begging defendant to stop, present a valid line of reasoning upon which one could conclude that defendant intentionally killed Ingoldsby during the course of the burglary. Further, inasmuch as there is little record support for a contrary conclusion, we find that " 'the evidence is of such weight and credibility as to convince us that the jury was justified in finding the defendant guilty [of first degree murder] beyond a reasonable doubt' " (*People v Mateo*, 2 NY3d 383, 410 [2004], *cert denied* — US —, 124 S Ct 2929 [2004], quoting *People v Cahill*, 2 NY3d 14, 58 [2003]; *see People v Delosh*, 2 AD3d 1047, 1049 [2003], *lv denied* 1 NY3d 626 [2004]).

Next, defendant argues that the police lacked probable cause to arrest him and, thus, County Court erred in denying his motion to suppress evidence obtained as a result of his arrest. We disagree and conclude that, at the point police arrested defendant on the outstanding warrant, they also had probable cause to arrest him for the burglary and murder. After Ingoldsby's body was discovered, the police questioned the neighbor who had witnessed defendant's agitation and had heard his threats against the apartment's occupants on the evening of the murder. The neighbor knew defendant and was able to positively identify him from several groups of photographs. Thus, the information relied upon by police was based upon the personal knowledge of an identified citizen "and was therefore presumptively reliable" (*People v Washington*, 256 AD2d 639, 640 [1998], *lv denied* 93 NY2d 880 [1999]) and sufficient to give the police a "reasonable cause to believe that [defendant] . . . committed [the] crime" (CPL 140.10 [1] [b]; *see People v Washington, supra*; *see also People v Jones*, 2 NY3d 235, 239 [2004]).

We also reject defendant's contention that he was denied a fair trial due to a conflict of interest arising from the fact that a staff member of the District Attorney's office was the victim's first cousin. This issue was raised prior to trial and County Court held a hearing at which it was established that the employee in question had only a remote relationship with the victim, having not seen him in over 10 years and that, at the office, she was completely isolated from any work related to the prosecution of the case. Under these circumstances, we conclude that no actual conflict of interest existed which warranted recusal by the District Attorney (*see People v Keeton*, 74 NY2d 903, 904 [1989]; *People v Vanderpool*, 217 AD2d 716, 718 [1995], *lv denied* 86 NY2d 847 [1995]; *Matter of Morgenthau v Crane*, 113 AD2d 20, 22-23 [1985]).

Turning to defendant's remaining contentions, we note that defendant failed to preserve the argument that he was entitled to a circumstantial evidence charge by a timely objection to the charge as given (*see* CPL 470.05 [2]). In any event, we conclude, first, that defendant was not entitled to the charge because the People's case was not wholly founded on circumstantial evidence and, second, that County Court accurately and clearly explained the rules governing the use of circumstantial evidence (*see People v Daddona*, 81 NY2d 990, 992 [1993]). Likewise, contrary to defendant's contention, we discern nothing improper, inaccurate or biased in County Court's instructions regarding the need for, and possible types of, corroboration of accomplice testimony. Finally, given defendant's prior criminal history and his demonstrated lack of remorse at sentencing, we find no abuse of discretion by County Court in imposing sentence, nor any extraordinary circumstances which would warrant a reduction in the sentence imposed (*see People v Glanda*, 5 AD3d 945, 952 [2004], *lvs denied* 3 NY3d 640, 674 [2004]; *People v Parker*, 290 AD2d 650, 652 [2002], *lvs denied* 97 NY2d 759 [2002], 98 NY2d 679 [2002]).

Mercure, J.P., Crew III, Peters and Kane, JJ., concur. Ordered that the judgment is affirmed.